William ARAMONY, Plaintiff,

v.

UNITED WAY OF AMERICA, individual-
ly and as administrator and named fidu-
ciary under the United Way of America
Replacement Benefit Agreement, United
Way Replacement Benefit Plan and
United Way Supplemental Benefits
Agreement, Defendants.

No. 96 Civ. 3962(SAS).

United States District Court,
S.D. New York.

Nov. 20, 1998.

Michael Bailey, Dennis W. Houdek, Falcone, Houdek, Bailey & Curd, LLP, New York, New York, for Plaintiff.

Elise M. Bloom, Jackson, Lewis, Schnitzler & Krupman, New York, New York, Sara E. Hauptfuehrer, Edmund W. Burke, Susan Harthill, Steptoe & Johnson, LLP, Washington, D.C., for Defendants.

*AMENDED OPINION AND ORDER*

SCHEINDLIN, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION .................................................152

II. FINDINGS OF FACT...............................................153
 A. The Parties ...............................................153
 B. The Agreements at Issue ...................................153
 1. Replacement Benefits Plan ...........................153
 a. The Executive Committee's Adoption of an RBP ....154
 b. Differences Between the Draft Plan and the Signed Plan ...........154
 c. 1990 Amendment to the RBP .......................155
 2. Supplemental Benefits Agreement .....................155
 3. Employment Agreement ................................155
 C. The Parties' Post–Termination Conduct.....................156
 D. Aramony's Criminal Conduct ...............................156
 1. Estoppel Effect of Aramony's Conviction .............157
 2. Evidence of Aramony's Misconduct Before September 1989 .............158
 E. Press and UWA Investigation of Misconduct ................159
 F. The Executive Committee's Awareness of Aramony's Misconduct ............160
 1. Miscoding Personal Expenditures as Business Expenses ..............161
 a. UWA's Review of Aramony's Expense Reports .......161
 b. The January 24, 1990 Anonymous Letter ...........161
 c. IGI's Briefings and Interim Reports .............161
 2. The Purchase of the Merlo Annuity ...................162
 3. The Purchase of the Florida Condominium .............163
 G. Government Investigations ................................163
 H. Media Coverage of the "Aramony Scandal"...................164
 I. UWA's Post–1991 Decline in Revenues ......................165

III. ARAMONY'S CLAIMS ..............................................166
 A. Counts One and Two for Benefits Under the RBP.............166
 1. Forfeiture of Benefits Under the RBP ................166
 a. Paulachak's Implied Authority ..................166

 b. Ambiguity in the Signed Plan ................................... 167
 c. Conclusion ...................................................... 168
 2. Amount of Aramony's Benefits Under the RBP ......................... 168
 a. Offsetting the Effect of the Tax Reform Act ...................... 169
 b. Offsetting the Effect of § 401(a)(17) ............................ 169
 3. Summary of Aramony's Claims for Benefits Under the RBP ............. 171
 B. Counts Five and Six Seeking Benefits Under the SBA ................... 171
 1. Forfeitability .......................................................... 171
 2. Waiver ................................................................ 171
 3. Conclusion ............................................................ 172
 C. Count Seven for Breach of Employment Agreement ....................... 172
 D. Count Eight for Breach of Agreement to Reimburse Fees and Costs ........ 173
 E. Count Ten for Unjust Enrichment ..................................... 173
 F. Count Twelve for Breach of Duty of Good Faith and Fair Dealing ........... 173
 G. Count Thirteen for Reformation of Agreements ........................... 173
 H. Prejudgment Interest ................................................ 173
 I. Attorneys' Fees ...................................................... 174
 J. Summary of Aramony's Claims ........................................ 175

IV. UWA's COUNTERCLAIMS ................................................ 175
 A. Count Four for Breach of Common Law Fiduciary Duty ................... 175
 1. Liability ............................................................... 175
 2. Damages .............................................................. 176
 a. Recovery of Aramony's Salary .................................... 176
 b. Recovery of Consequential Damages .............................. 176
 i. Lost Dues ................................................... 177
 a) Reduction in Dues Percentage ........................... 177
 b) Reduction in Funds Raised ............................... 178
 ii. Costs Associated With the Locals' Dissatisfaction With UWA ......................................................... 178
 iii. Legal Fees and Costs ........................................ 179
 iv. IGI Investigative Fees ....................................... 180
 v. Accountants' Fees ........................................... 180
 vi. Media Relations Services & Videotape Production ............. 180
 vii. Cost of UWA's Presidential Search ........................... 181
 viii. Travel Costs ................................................ 181
 B. Count Five for Breach of Fiduciary Duty of Loyalty Under New York Not–for–Profit Law .................................................. 181
 C. Count Two for Breach of Employment Agreement ....................... 181
 1. Liability ............................................................... 181
 2. Damages .............................................................. 181
 D. Count Three for Breach of Covenant of Good Faith and Fair Dealing ........ 182
 E. Prejudgment Interest ................................................ 182
 F. Punitive Damages ................................................... 182
 1. Legal Standard ........................................................ 182
 2. Award of Punitive Damages ............................................ 184

V. CONCLUSION ........................................................... 184

## I. INTRODUCTION

William Aramony, the President and Chief Executive Officer of the United Way of America ("UWA") for twenty-two years, was fired in 1992, after an investigation revealed that he had violated his office by engaging in fraudulent, dishonest and criminal conduct. His motive for these crimes is apparent—his personal enjoyment and financial benefit. In addition to losing his job, he was convicted of various crimes and sentenced to seven years in jail, a term he is now serving. He will not be released from jail until he is 75 years old.

Despite the fact that he is now a convicted felon, he does not lose the right to sue and seek compensation in the courts of law. Aramony claims that he is contractually entitled to certain pension benefits and salary from his former employer. He also claims that he is entitled to reimbursement for legal ex-

penses incurred in an effort to settle these claims with UWA following his termination. Aramony asserts that UWA owes him a total of $7.2 million, including pre-judgment interest and attorneys' fees and costs. UWA denies any liability.

UWA, in turn, has counterclaimed against Aramony, alleging that he breached both his fiduciary duty to UWA and his employment contract. UWA claims it is entitled to $2.1 million as reimbursement for the compensation that it paid Aramony during the period of his disloyalty and to consequential damages of between $16 million and $37 million, which it allegedly suffered as a result of his misconduct. In addition, UWA seeks an award of punitive damages if UWA's proven actual damages do not completely offset any amount that is owed to Aramony. In response, Aramony asserts that UWA has waived its claims and defenses against him by supporting him at a time when it was fully aware of his criminal conduct. Aramony also asserts that UWA's damages fail for lack of proximate cause and because they are speculative.

In the course of this lengthy Opinion, I conclude that UWA owes Aramony certain monies, and that Aramony owes certain monies to UWA. I am concerned, however, that a simple but important principle may be overlooked in the plethora of details that follow. A felon, no matter how despised, does not lose his right to enforce a contract. On the other hand, his recovery of any contractual benefit does not diminish the seriousness of his criminal conduct, for which he is being severely punished. It is important that the many good people who are contributors to the United Way of America understand these important principles of our system of justice.

This action was tried to the Court on September 17, 18, 23, 24 and 28, 1998. The following constitutes the Court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. *The Parties*

UWA is a non-profit corporation organized under the laws of New York and having its principal place of business in Alexandria, Virginia. Joint Pre–Trial Order ("JPTO") at ¶ 5(a). UWA is governed by a volunteer Board of Governors and a full-time President and Chief Executive Officer ("CEO"). *Id.* The Executive Committee of UWA's Board of Governors ("Executive Committee") is a sub-committee of the Board of Governors that is authorized to adopt pension plans and executive compensation arrangements on behalf of UWA. *Id.* at ¶ 5(k). Aramony served as UWA's President and CEO from 1970 until March 16, 1992. *Id.* at ¶ 5(b).

### B. *The Agreements at Issue*

#### 1. *Replacement Benefits Plan*

On February 27, 1984, the Executive Committee voted to adopt a non-qualified pension plan ("Replacement Benefit Plan" or "RBP"), which was intended to replace benefits that could not be paid under UWA's qualified defined benefit pension plan as a result of limitations imposed by the Internal Revenue Code ("I.R.C."). JPTO at ¶ 5(*l*). UWA's highly paid executives, including Aramony, whose qualified pension benefits were likely to be affected by the I.R.C. restrictions were eligible for this Replacement Benefit Plan. *Id.*

The parties dispute which of two versions of the RBP is controlling. The version favored by UWA is a draft plan that was distributed at the February 27, 1984 Executive Committee meeting at which the RBP was approved ("Draft Plan"). *See* Defendant's Exhibit ("Def.'s Ex.") G. The plan document favored by Aramony was generated by the contracts department of Mutual of America Life Insurance Co. ("Mutual") in May 1985 and signed by Stephen Paulachak on behalf of UWA on May 16, 1985 ("Signed Plan"). *See* Plaintiff's Exhibit ("Pl.'s Ex.") 1. At that time, Paulachak was a Senior Vice President of UWA and was the person principally responsible for handling UWA's pension plans and executive compensation arrangements. JPTO at ¶ 5(e).

On May 6, 1985, UWA and Mutual signed a group annuity contract, in which UWA agreed to pay Mutual the funds necessary to satisfy the benefits promised under the RBP.

*See* Pl.'s Ex. 34. The annuity contract provided that Mutual would "make periodic estimates, in accordance with accepted actuarial principles, of the amount of [UWA's] contributions appropriate to fund the Plan." *Id.* at § 1.2. Upon receipt, contributions were allocated to a single interest-bearing funding account. *Id.* at §§ 2.1, 2.2. Retirement benefits were to be paid from the funding account in the form of either a lump sum or a monthly annuity. *Id.* at § 2.3.

### a. *The Executive Committee's Adoption of an RBP*

The general practice at UWA was for the Executive Committee to adopt the *concept* of a pension plan, but not to decide the details of the plan, which were then to be worked out by Paulachak and Mutual. For example, in 1989, UWA's Executive Committee voted to set a maximum interest rate at which RBP benefits would be calculated. After UWA's Executive Committee approved the concept of such a plan, Paulachak was directed to work out the details and develop a plan document with Mutual. Testimony of Stephen Paulachak, UWA's former Chief Financial Officer ("CFO") and Senior Vice President, dated September 23, 1998 ("Paulachak Tr."), 429, 445.

The Executive Committee followed this procedure in approving an RBP at its February 27, 1984, meeting. Paulachak distributed an agenda at the meeting setting forth the basic principles of the RBP, as well as the general features of other pension-related plans which were approved at the same meeting. *See* Def.'s Ex. E. Attached to the agenda was a sample plan document, which was not in the form of a final plan document. *See* Paulachak Tr. at 413. The Draft Plan (1) had blanks in which to write such terms as the effective date and the governing law; (2) set forth various options for determining eligibility and calculating benefits without indicating which options were controlling; and (3) lacked a signature, or even a signature line. *See* Def.'s Ex. E.

In his agenda, Paulachak explained the purposes of the RBP: (1) to restore the pension benefit lost under the Qualified Plan due to the restrictions imposed by I.R.C. § 415;[1] and (2) to restore the pension benefit lost as a result of Rev. Rul. 80–359, which excluded deferred compensation from the definition of compensation under UWA's qualified plan. *See* Def.'s Ex. E at 2. The agenda did not mention the forfeitability of benefits, nor any other details of the proposed pension plan. The agenda's reference to an RBP concluded with a recommendation that the Board "authorize United Way of America to establish a Replacement Benefit Plan, with a Plan commencement date of April 1, 1984, as outlined under [the attached Draft Plan]." Def.'s Ex. E at 3.

The minutes of the meeting show that the Executive Committee followed Paulachak's recommendation and authorized UWA to establish an RBP. *See* Pl.'s Ex. 2. Consistent with its usual practice, the Committee expected that Paulachak would work out the specific terms of the plan with Mutual. *See* Deposition of Robert A. Beck, former Chairman of UWA's Board of Governors, dated October 8, 1996 ("Beck Dep."), at 22 (in approving the RBP, "the Board and/or the Executive Committee would get into enough detail to understand what was being proposed but certainly not into the drafting phase or—or the real detail particulars of the plan.... [Those details] would be [left to] the employee benefit people who are our advisors.").

Paulachak then informed Mutual that the Board had approved an RBP and requested that Mutual create a final plan document. *See* Paulachak Tr. at 413. For reasons that are not entirely clear, Mutual did not provide Paulachak with a final plan document until May 1985. *See* Paulachak Tr. at 415. On May 16, 1985, Paulachak signed Mutual's plan document on UWA's behalf. *See* Pl.'s Ex. 1.

### b. *Differences Between the Draft Plan and the Signed Plan*

Though the provisions of the Signed Plan are nearly identical to those of the Draft

---

**1.** I.R.C. § 415 imposes dollar limitations on the amount of benefits that can be paid out under a qualified pension plan.

Plan that Paulachak presented to the Executive Committee, the plan documents differ in two important respects. First, Article V of the Signed Plan, entitled "Contributions and Benefits," sets forth formulae that calculate pension benefits based on the effect of various I.R.C. limitations on the participants' defined *contribution* plan, *see* Pl.'s Ex. 1, while Article V of the Draft Plan, entitled "Benefits," contains formulae which compensate for benefits lost under the participant's defined *benefit* plan. *See* Def.'s Ex. E. This difference is important because UWA's qualified pension plan was a defined benefit plan, and UWA had no defined contribution plan. *See* Paulachak Tr. at 396.

The second difference between the Draft Plan and the Signed Plan concerns plan forfeitability. Article IV of the Draft Plan provides as follows:

> *Section 4.01.* The right to the payment of any amount provided under this Plan shall be subject to *forfeiture upon the commission of* a prohibited act by the Participant. A prohibited act shall be the commission of *a fraud, embezzlement or other felony involving the Employer for which the Participant has been convicted* in a Court of competent jurisdiction.
>
> *Section 4.02.* Except as may be provided in Section 4.01, the Participant's rights under this Plan shall become nonforfeitable upon termination of employment.

Def.'s Ex. E. at 4 (emphasis added). The Signed Plan, in contrast, does not provide for the forfeiture of benefits. Rather, Article IV of the Signed Plan provides, in its entirety, that "[t]he Participant's rights under this Plan shall become non-forfeitable upon termination of employment."[2] Pl.'s Ex. 1 at 3.

#### c. *1990 Amendment to the RBP*

By resolution dated September 12, 1990, UWA's Executive Committee amended the RBP to add a component which would replace benefits lost under UWA's qualified benefit plan as a result of a change in the benefit formula that was mandated by the Social Security integration rules of the Tax Reform Act of 1986 ("TRA"). *See* Pl.'s Ex. 30; Tr. at 338. However, no plan document incorporating the 1990 Amendment was ever generated.

#### 2. *Supplemental Benefits Agreement*

On October 12, 1984, Aramony and UWA entered into a Supplemental Retirement Benefits Agreement ("SBA"), with a term from January 1, 1985 to December 31, 1988. *See* Pl.'s Ex. 63. By its terms, the SBA promised a benefit at retirement equal to the balance of a hypothetical account to which UWA had contributed $2,083.33 per month and, at its option, invested in such manner as UWA determined. *See id.* The SBA does not contain any provision that would preclude or mandate the forfeiture of a participant's pension benefits. *See Aramony v. United Way of America,* 96 Civ. 3962, 1997 WL 732447, at *7 (S.D.N.Y. Nov. 24, 1997) (*"Aramony I"*).

The SBA was amended in 1988 to cover the additional period beginning January 1, 1989 through July 31, 1993. *See* Pl.'s Ex. 64. The parties agree that unless he forfeited his SBA benefits in whole or in part, Aramony was entitled to receive a lump sum payment of $308,757.39 on or about March 16, 1992. *See* JPTO at ¶ 5(j).

#### 3. *Employment Agreement*

Aramony and UWA entered into an employment agreement on September 12, 1988 for the term January 1, 1989 through July 31, 1993 ("Employment Agreement"). *See* Pl.'s Ex. 65. Paragraph 2 of the Employment Agreement, entitled "Duties," provides, in part, that "Aramony agrees to serve the

---

**2.** A comparison of Section 9.03 in the Draft Plan and the Signed Plan also reflects this difference. In the Draft Plan, Section 9.03 provides that: This Plan may be amended or terminated in whole or in part from time to time by the Board of Trustees of the Employer, upon recommendation of the Committee.... If the Plan is terminated, *and except as otherwise provided in Section 4.01,* benefits earned to the

date of Plan termination shall be nonforfeitable, and shall be distributed in accordance with the terms of this Plan.
Def.'s Ex. E at 11 (emphasis added). Section 9.03 of the Signed Plan is identical, except that it omits the underlined language that would allow for the forfeiture of benefits upon the commission of a felony. *See* Pl.'s Ex. 1 at 7.

Corporation faithfully and to the best of his ability." JPTO at ¶ 2.

Aramony's base salary (including deferred compensation) for the period from 1986 through 1992 was as follows:

| YEAR | BASE SALARY |
| --- | --- |
| 1986 | $275,000 |
| 1987 | $300,000 |
| 1988 | $320,000 |
| 1989 | $345,000 |
| 1990 | $365,000 |
| 1991 | $390,000 |
| 1992 | $390,000 |

*See id.* at ¶ 5(d). This compensation was approved annually by the Executive Committee, which was advised by outside consultants. *See id.* at ¶ 5(xx). UWA has not paid Aramony's salary since March 16, 1992, the date his employment was terminated.

### C. The Parties' Post–Termination Conduct

In early March 1992, Aramony and UWA began negotiations to resolve all outstanding issues. *See id.* at ¶ 5(ff). On the recommendation of UWA's attorneys at Verner, Liipfert, Bernhard ("Verner Liipfert"), Aramony retained Thomas H. Boggs, Jr. of the firm Patton, Boggs & Blow to represent him in the negotiations. *See id.;* Testimony of William Aramony, dated Sept. 17, 1998 ("Aramony Tr.") at 184–85, 272–74. In these negotiations, Aramony sought payment of the amounts allegedly due him under UWA's non-qualified pension plans. *See* JPTO at ¶ 5(ff). In May 1992, the parties agreed to a mechanism intended to help bring these matters to a negotiated conclusion (the "Panel

Process"). *Id.* No settlement agreement was ever signed. *Id.* at ¶ 5(gg).

Aramony claims that John Akers, Chair of UWA's Board of Directors, promised that UWA would pay the legal fees he incurred during these post-termination negotiations and attempted mediation. *See* Aramony Tr. at 184–85. Akers, however, has no recollection of making such a promise. *See* Akers Tr. at 224.

On March 6, 1992, Boggs sent Aramony a retainer agreement which provided that UWA would be responsible for Aramony's legal expenses. *See* Def.'s Ex. Y at 1. Below Boggs' signature at the end of the letter are two signature lines, one for Aramony and one for UWA. *Id.* at 3. UWA did not sign the retainer agreement, nor did it agree to cover Aramony's legal fees in any subsequent correspondence. Indeed, the only mention of the attorneys' fees issue by UWA's counsel was made in a letter to Boggs, dated September 3, 1992, which states that "a commitment of indemnification [by UWA] is impossible at this time." Def.'s Ex. D2. Based on the preponderance of the credible evidence, I find that neither Akers nor any other UWA officer or director promised Aramony that UWA would pay for any of his legal fees.

### D. Aramony's Criminal Conduct

In September 1994, a federal grand jury sitting in the Eastern District of Virginia returned an indictment against Aramony, Paulachak, Thomas Merlo [3] and Partnership Umbrella, Inc. ("PUI") one of the so-called "spin-off" entities.[4] *See* Def.'s Ex. L (Re-

---

3. Merlo was a financial consultant for UWA in 1988 and 1989 and served as UWA's CFO from 1989 until 1992.

4. UWA formed a number of separate, but affiliated, non-profit and profit corporations, called "spin-offs," to perform specific functions, many of which had previously been performed in-house at UWA. *See* Pl.'s Ex. 79; Def.'s Ex. O at 9–10. The spin-offs were approved by UWA's Board of Directors, with the following goals in mind: (1) performance of certain functions could be enhanced if accomplished by an organization with a single purpose, rather than by UWA; (2) distancing UWA from money-making activities would protect its tax-exempt status; and (3) relying on spin-offs to perform various functions

would conserve UWA's resources. *See* Def.'s Ex. O at 9. PUI was a spin-off which negotiated the bulk purchase of goods and services so that charities, including UWA, could earn volume discounts. *See* Pl.'s Ex. 79; Def.'s Ex. O at 9–10. Other spin-offs included Professional Travel Systems, Inc., which was established to provide non-profit organizations with travel planning services and discounted travel rates; Gifts In Kind, Inc., which was to coordinate the disbursement of charitable donations of tangible personal property, such as computer equipment, clothing, and furniture; Charities Fund Transfer, Inc., which was to simplify and speed the distribution of donations made to the local United Ways, through a computer network; Sales Service/America, which was intended to sell merchandise featuring the United Way logo, as well

dacted Indictment). The charges involving PUI were ultimately dismissed on motion of the United States. *See* JPTO at ¶ 5(ii).

On June 22, 1995, judgments of conviction were entered against Aramony, Merlo, and Paulachak. *See* Def.'s Ex. M. The convictions were based on a redacted version of the original indictment, which had been modified to reflect dismissal of the PUI counts. *See* Def.'s Ex. L. Aramony was convicted on Count One of the Redacted Indictment, which alleged a violation of 18 U.S.C. § 371, entitled "Conspiracy." *See* Def.'s Exs. L, M. Aramony was also convicted on Counts Two and Four through Eight of the Redacted Indictment, alleging violations of 18 U.S.C. § 1341, and entitled "Frauds and swindles." [5] *See id.* Aramony was further convicted on Count Three of the Redacted Indictment, alleging a violation of 18 U.S.C. § 1343, entitled "Fraud by wire, radio, or television." [6] *Id.* Finally, he was convicted on Counts Eleven and Thirteen through Nineteen of the Redacted Indictment, alleging violations of 18 U.S.C. § 2314, entitled "Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting." [7] *Id.* at ¶ 5(mm).

On July 17, 1996, the Court of Appeals for the Fourth Circuit vacated Aramony's conviction on two counts of interstate transportation of fraudulently acquired property in violation of 18 U.S.C. § 1957, thereby vacating the $552,188.97 criminal forfeiture order predicated on those counts, and remanded to the Eastern District of Virginia for resentencing. *See United States v. Aramony*, 88 F.3d 1369, 1387 (4th Cir.1996). The Supreme Court denied Aramony's petition for certiorari on May 27, 1997. *See Aramony v. United States*, —— U.S. ——, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997). On remand, the Eastern District of Virginia adjusted Aramony's sentence upward, and again imposed a seven year sentence which he is currently serving at the federal prison camp at Seymour Johnson Air Force Base in Goldsboro, North Carolina. In addition, the district court imposed a $300,000 criminal fine and a $1,150 special assessment in lieu of the criminal forfeiture. *See* Judgment of April 25, 1997 (*United States v. William Aramony* ), E.D.Va., No. 1:94CR00373-001 at JA0392 and JA0394. This sentence is now on appeal.

1. *Estoppel Effect of Aramony's Conviction*

UWA claims that because Aramony was convicted of various crimes which victimized the company, he is estopped from denying that he engaged in the misconduct underlying his convictions. Because Aramony's conviction conclusively determines certain facts, it is necessary to determine the precise scope of the estoppel.

As a result of his six mail fraud convictions and one wire fraud conviction, Aramony is estopped from denying that on at least seven occasions between September 1989 and May 1990, he knowingly devised or participated in

---

as UWA films and publications. *See* Def.'s Ex. O at 9–10; Pl.'s Ex. 79.

**5.** Aramony was convicted of the following mail fraud counts charged in the Redacted Indictment: Count Two charged Aramony with billing UWA for personal trips to Gainseville, Florida between October 1989 and August 1990; Count Four charged Aramony with making a payment of $10,000 of UWA funds for the furnishing of a Florida condominium in March 1990; Counts Five and Six charged Aramony with billing UWA for personal hotel accommodations in December 1989 and January 1990; Count Seven charged Aramony with causing UWA to pay for Aramony's personal car rentals from September 1989 until July 1990; Count Eight charged Aramony with billing UWA for the travel expenses of Lori Villasor, his alleged girlfriend, in May 1990.

**6.** This wire fraud count charged Aramony with billing UWA for a personal vacation to Egypt in December 1989.

**7.** Aramony was convicted of the following counts of interstate transportation of fraudulently obtained property: Count Eleven charged Aramony with causing UWA to expend $5,000 as payment to Merlo in October 1989; Count Thirteen charged Aramony with causing UWA to expend $10,000 for the furnishing of a Florida condominium in March 1990; Count Fourteen charged Aramony with causing UWA to expend $375,-0000 to purchase an annuity for Merlo in April 1990; Count Fifteen charged Aramony with causing UWA to expend $125,000 to purchase a Florida condominium in April 1990; and Counts Sixteen through Nineteen charged Aramony with causing UWA to pay for his personal use of a chauffeured car on four occasions between September 1989 and February 1991.

a scheme or artifice to defraud UWA or to obtain money or property from UWA by means of false or fraudulent pretenses, representations, or promises, and that he specifically intended to defraud UWA on each occasion. *See Aramony v. United Way of America*, 96 Civ. 3962, 1998 WL 205331, at *7 (S.D.N.Y. Apr. 27, 1998) (*"Aramony II"*). Additionally, as a result of his convictions on eight counts of interstate transportation of fraudulently obtained property, Aramony is estopped from denying that he transported money or property that he knew had been taken from UWA by means of misrepresentations or deceit or aided and abetted such conduct. *See id.*

Based on the facts alleged in the Redacted Indictment, I specifically find that Aramony improperly billed UWA for personal expenses, including (1) personal trips to Gainesville, Florida (Count Two); (2) personal hotel accommodations (Counts Five and Six); (3) personal car rentals (Counts Seven and Sixteen through Nineteen); (4) his girlfriend's travel expenses (Count Eight); (5) a personal, overseas vacation (Count Three); and (6) the furnishing of a Florida condominium (Counts Four and Thirteen). I further find that this billing of personal expenditures spanned the period from September 1989 until December 1991.[8] In addition, I find that Aramony fraudulently caused UWA to expend $375,000 to purchase an annuity for Merlo in April 1990 (Count Fourteen), and to expend $125,000 to purchase a Florida condominium in April 1990 (Count Fifteen). Finally, I find that Aramony fraudulently caused UWA to expend $5,000 as a payment to Merlo for services that he had not performed (Count Eleven).

Accordingly, Aramony's criminal conduct, which occurred between September 1989 and December 1991, can be reduced to the following four categories: (1) charging of personal expenditures as business expense; (2) the purchase of the $375,000 Merlo annuity; (3) the purchase of the Florida condominium; and (4) the $5,000 payment to Merlo.

### 2. Evidence of Aramony's Misconduct Before September 1989

UWA introduced the testimony of two witnesses who testified at Aramony's criminal trial: Rita Duncan and Laura Gorme. Duncan worked as Aramony's assistant between September 1982 and September 1989, during which time she was responsible for planning his daily schedule and for preparing his expense reports. *See* Testimony of Rita K. Duncan, dated March 13, 1995 ("Duncan Tr."), at 1049–51, 1062. In 1984, UWA hired Laura Shifflett (now Laura Gorme), who assisted Duncan in preparing Aramony's expense reports until Duncan left UWA, at which time Shifflett became solely responsible for the expense reports. *See id.* at 1062; Testimony of Laura Gorme, dated March 14, 1995 ("Gorme Tr."), at 1295–96.

While he was traveling, Aramony called his office nightly to report each day's expenditures and when he returned to the office, Aramony provided Duncan and Shifflett with a folder of receipts. *See* Duncan Tr. at 1061–62. Duncan and Shifflett then prepared Aramony's expense reports by comparing Aramony's claimed expenses with his calendar. *See id.* at 1062–63. UWA's expense report forms required that details be provided for each expense, including the date and place of the expense, the names of those entertained and the business purpose. *See, e.g.,* Def.'s Exs. U, W. The expense reports also required that each expense be assigned a descriptive code; for example, UWA had codes for "local United Way travel," "large conferences," "general administration," and "miscellaneous." *See id.;* Duncan Tr. at 1063.

Aramony regularly provided receipts for expenditures which his assistants knew to be

---

**8.** UWA is seeking consequential damages caused by Aramony's criminal conduct. To determine the propriety of such a damage award, Aramony's acts of misconduct must be specifically identified. Aramony's conviction under Count One for conspiracy to commit various federal crimes in violation of 18 U.S.C. § 371 does not support UWA's claim for damages as the jury's verdict of guilty on Count One does not reveal what specif-

ic conduct it relied on in reaching that verdict. *See Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 569, 71 S.Ct. 408, 95 L.Ed. 534 (1951) (estoppel effect of conspiracy conviction was limited because "[a] general verdict of the jury or judgment of the court without special findings does not indicate which of the means charged in the indictment were found to have been used in effectuating the conspiracy.").

personal in nature. Duncan and Shifflett improperly coded these charges as business expenses, typically using the code for "local United Way" or "general administration," so that Aramony would be reimbursed for these expenditures, which included personal airline travel, car rentals, hotel bills, and meals. *See* Duncan Tr. at 1064–65; Gorme Tr. at 1308. To further conceal the nature of Aramony's personal dinner charges, Aramony's assistants wrote in the names of UWA-affiliated personnel as dinner companions, using as many as four names, depending on the amount of the charge. Duncan Tr. at 1066–69; Gorme Tr. at 1308–09. Such "creative coding" occurred on a *monthly* basis from 1982 through at least September 1989. *See* Duncan Tr. at 1064–65; Gorme Tr. at 1308.

While Aramony does not dispute that some of his expenses were miscoded, he denies that he knew it was occurring. His denial is disingenuous. In the first place, it was Aramony who called in the expenses and provided Duncan and Shifflett with receipts which he knew covered personal expenditures. In addition, Aramony often falsified his meal receipts himself by including the names of business associates with whom he had not dined. *See* Duncan Tr. at 1079. Furthermore, Aramony occasionally reviewed the falsified expense reports before they were submitted to UWA, but never once informed Duncan or Shifflett that they had improperly included a personal expense. *See* Duncan Tr. at 1081; Gorme Tr. at 1311. Finally, Duncan credibly testified concerning one occasion on which she asked Aramony how she could possibly assign a business code to a receipt for two bottles of champagne that Aramony had purchased with his girlfriend; Aramony curtly responded, "just code it, that's your job, do it." Duncan Tr. at 1078.

Based on the evidence presented at trial, I find that between 1982 and September 1989, Aramony, through his assistants, regularly miscoded personal expenditures as business expenses, for the purpose of obtaining reimbursement from UWA.

E. *Press and UWA Investigation of Misconduct*

In November or December 1991, UWA learned that newspaper reporters had contacted UWA employees seeking information about Aramony and UWA. *See* Testimony of Lisle C. Carter, Jr., UWA's former General Counsel ("Carter Tr.") at 1803; Aramony Tr. at 170; Akers Tr. at 220–21. The reporters' questions concerned Aramony's lifestyle, particularly his high salary and his use of the Concorde and chauffeured cars on UWA business, the relationship between UWA and its "spin-off" companies, and Aramony's hiring of Merlo as UWA's CFO. Aramony Tr. at 171; Testimony of Kathryn Baerwald, UWA's former General Counsel ("Baerwald Tr."), at 453–54. Upon learning of these inquiries, UWA retained the public relations firm of Hill & Knowlton to advise it in formulating a strategy for minimizing the impact these allegations would have on the public. *See* Carter Tr. at 1843; Aramony Tr. at 112–13; Baerwald Tr. at 469.

In December 1991, Carter retained the Investigative Group, Incorporated ("IGI") to investigate the issues raised by the press. *See* Carter Tr. at 1843; Akers Tr. at 220–21; Baerwald Tr. at 453–54. IGI was to prepare an internal report for UWA's Board of Governors. *See* Carter Tr. at 1843–44; Akers Tr. at 220–21. Then, in January 1992, UWA retained the law firm of Verner Liipfert to broaden the scope of IGI's investigation. *See* Baerwald Tr. at 458–59. A joint Verner Liipfert–IGI report was presented to UWA's Board and released to the public on April 2, 1992. *See* Def.'s Ex. O.

Sometime thereafter, UWA retained Coopers & Lybrand, a national accounting firm, to perform an audit of the expenses that were discussed in the IGI report. Baerwald Tr. at 469. The accounting firm then audited the records of the spin-off corporations and Aramony's and Merlo's expense reports. *See* Baerwald Tr. at 469, 476–77. UWA later hired Smith & Haroff, another media consulting firm, to provide its senior officials with advice and media training in anticipation of inquiries that would inevitably come if Aramony were indicted. *See* Testimony of Charles Kolb, UWA's former General Counsel ("Kolb Tr."), at 557–8. UWA paid Smith & Haroff $4,950 for these services. *See* Def.'s Ex. C3.

In response to the indictments of Aramony, Paulachak, Merlo, and PUI, UWA pro-

duced a videotape discussing the indictment, which was disseminated to the local United Ways. Kolb Tr. at 559–60. UWA paid $4,788 for the production of this videotape. *See* Def.'s Ex. X3.

Initially, IGI's investigation was to address the issues raised by the press. *See* Baerwald Tr. at 455. By January 1992, the IGI investigation was focused on Merlo's financial dealings and his employment at UWA. Less central issues included Aramony's reimbursement of personal expenses and the management of the spin-off companies. *Id.* at 456. Then, in February 1992, the joint Verner Liipfert–IGI investigation focused more closely on Aramony and his expenditures, as well as his alleged transfer of monies between two spin-offs.[9] *See id.* at 459. By the end of February 1992, the IGI investigation centered on Aramony's charging of personal expenses to UWA. *See id.* at 460.

The April 2, 1992 Verner Liipfert–IGI report, which UWA's Board released to the public, described a wide range of improprieties at UWA. The report found that the management and operations of UWA were "handled with an unacceptable degree of informality and deference to the desires of its two principal officers [Aramony and Merlo]." Def.'s Ex. O at 2. The report analyzed ten specific areas of concern: (1) the proliferation of spin-off organizations, concluding that the spin-offs were insufficiently accountable to UWA and that some had engaged in improper financial transactions. *see id.* at 7–34; (2) UWA's payment of unjustified consulting fees to three individuals who had a close relationship with Aramony. *see id.* at 34–35; (3) Aramony's and Merlo's travel expenditures which included an undetermined number of personal charges billed to United Way, in addition to their use of first-class travel and limousine services. *see id.* at 36–40; (4)

the insufficiency of financial controls at UWA which allowed Aramony, Merlo and Paulachak to make payments to "various individuals" for "questionable purposes." *see id.* at 40–41; (5) UWA's procedure for setting executive compensation. *see id.* at 41–43; (6) UWA's qualified and non-qualified pension plans were adopted without sufficient expertise or oversight. *see id.* at 43–47; (7) UWA's lack of sufficient documentation concerning the nature or status of an unidentified restricted grant. *see id.* at 47; (8) the adequacy of UWA's controls and procedures as custodian of certain federal grant monies. *see id.* at 47–48; (9) allegations that Aramony had made sexual advances to UWA employees. *see id.* at 48; and (10) recommended changes to the structure and role of UWA's Board of Governors. *see id.* at 48–52.

F. *The Executive Committee's Awareness of Aramony's Misconduct*

On February 3, 1992, IGI provided the Chairman of the Executive Committee, LaSalle Leffall, with a copy of an interim report. That same day, UWA's Executive Committee met by conference call to discuss the report. Based on the information that was then available, the Executive Committee took a unanimous vote of confidence in William Aramony. *See* Pl.'s Exs. 107, 109.

Later in February, Berl Bernhard, UWA's outside counsel, scripted the following public relations effort. Aramony was to read a letter of resignation to the Executive Committee, which would reject his resignation and would instead issue a second vote of confidence. *See* Aramony Tr. at 178–79. Bernhard drafted Aramony's letter of resignation, which was signed by Aramony, and Bernhard read the letter to the members of the Executive Committee during a February 26, 1992 conference call. *See id.* at 180–82.

---

**9.** IGI issued two interim reports which addressed six specific allegations. Those allegations concerned: (1) Aramony's misuse of UWA credit cards, personnel and other resources; (2) Aramony, his close associates and son personally benefitting from their relationships with "spin-off" organizations; (3) Aramony's arranging for PUI to hire his son, Robert; (4) UWA's paying for expenses that Aramony incurred as a result of his affiliations with various spin-off organizations; (5) Aramony's use of UWA resources for the enjoyment of personal relationships; and (6)

Aramony's hiring of "cronies" and installing them in senior positions within the organization. *See* Pl.'s Exs. 177 at 2, 178 at 2. In preparing the interim reports, IGI reviewed corporate and personal documents relating to Aramony, including his expense reports, travel records, corporate credit card records, telephone logs, check vouchers, appointment calendars, and selected personal records. *See* Pl.'s Exs. 177 at 2, 178 at 2. IGI also conducted four interviews with Aramony, as well as interviews with others.

Bernhard also read to the Committee members a letter which he had drafted for Leffall, which rejected Aramony's resignation offer. *See id.;* Pl.'s Ex. 162. That letter, which was addressed to Aramony, requested that he remain in place during the transition to a new President and CEO. *See id.* The letter concluded by praising Aramony's contributions to UWA and stating that the Executive Committee had reaffirmed its vote of confidence in him. *Id.* After hearing the two letters, the Executive Committee discussed the matter, approved the Leffall letter, and reaffirmed its vote of confidence in Aramony. *See* Aramony Tr. at 179–181.

Aramony contends that by the time that UWA's Executive Committee gave him the two votes of confidence and rejected his letter of resignation, its members were aware of his misconduct and thus waived their right to terminate him or to recover damages for that conduct. In particular, Aramony contends that UWA knew that he had miscoded personal expenditures as business expenses, that he had arranged for Merlo to receive a $375,-000 annuity, and that he had caused Voluntary Initiatives/America ("VIA"), a Florida non-profit corporation established in 1990 to distribute the William Aramony Voluntarism in America funds, to spend $125,000 on a condominium in Florida.

### 1. *Miscoding Personal Expenditures as Business Expenses*

#### a. *UWA's Review of Aramony's Expense Reports*

There is a complete absence of credible evidence that either UWA's Audit Committee, or any other UWA personnel who reviewed Aramony's expense reports, knew that Aramony had charged personal expenses to UWA. Rather, the deliberate miscoding of Aramony's personal expenditures and the inclusion of fictitious dinner companions made the expenditures appear, on their face, to be legitimate business expenses. *See* Testimony of Gregory Walthall, UWA's former Controller ("Walthall Tr."), at 1439; Gorme Tr. at 1338; Def.'s Ex. U, W.

#### b. *The January 24, 1990 Anonymous Letter*

On January 24, 1990, a number of members of the Executive Committee received an anonymous letter accusing Aramony of various improprieties. *See* Carter Tr. at 1796. Specifically, the letter alleged: (1) that Aramony had been involved in affairs with two sisters—one of whom was a teenager; (2) that he had paid money to keep the sisters' family quiet; and (3) that Aramony's ownership of PUI, one of UWA's spin-offs, together with other UWA officers, was improper. *See* Pl.'s Ex. 75. The letter did not mention Aramony's charging of personal expenses to UWA, nor any of the other misconduct that is at issue in this case.[10] *Id.* In short, the anonymous letter did not alert the Board to Aramony's "creative coding." [11]

#### c. *IGI's Briefings and Interim Reports*

On two different occasions in mid- to late January 1992, IGI investigators met with Baerwald and Leffall to update them on IGI's progress. *See* Baerwald Tr. at 480–

---

**10.** The letter also claimed that Richard O'Brien, UWA's chief operating officer, and other senior managers at UWA could confirm the details of Aramony's affairs and the cover-up. *See* Pl.'s Ex. 75. UWA's then-chairman, Edward Brennan, met with Aramony in Florida concerning the allegations made in the letter. *See* Brennan Tr. at 1233–36. Aramony did not admit to making any payments of "hush money" or committing any other financial improprieties. Aramony Tr. at 164–65; Brennan Tr. at 1234, 1237; Carter Tr. at 1797. There was contradictory evidence at trial as to whether Aramony admitted his relationship with Laurie Villasor, a teen-age girl. *See* Aramony Tr. at 164–65; Brennan Tr. at 1236–37, 63; Testimony of Cheryl Wills, former member of the UWA Board of Governors at 372–73; *see also* Carter Tr. at 1833–34. Subsequent-

ly, Brennan questioned O'Brien and Lisle Carter concerning the letter. *See* Brennan Tr. at 1239–41. Neither could confirm any of its details, and the matter was dropped. *Id.;* Carter Tr. at 1835–36; Akers Tr. at 220.

**11.** A second anonymous letter was received by Board members in the Spring of 1990. *See* Pl.'s Ex. 112 at unnumbered p. 3. This letter also alleged the misuse of funds and threatened to take the issue to the media if Aramony was not dismissed. *See id.* (summarizing letter). However, the specific allegations made in the letter were not presented at trial. Accordingly, I have no basis on which to conclude that the Board *knew* of the miscoding of personal expenses as a result of receiving the second letter.

503; Pl.'s Exs. 199, 200. At the first meeting, IGI investigators informed Baerwald and Leffall that they had questions concerning Aramony's reimbursement of personal expenditures. *Id.* at 479. At the later meeting, IGI specifically discussed the issue of Aramony's trips to Worcester, Massachusetts, Miami, Las Vegas, and Boston. *Id.* at 486–87, 489–92. At that time, however, the IGI investigation was ongoing, and the investigators reported that the expenditures issue required further investigation. *See* Baerwald Tr. at 503.

Then, on February 3, 1992, IGI provided UWA's Executive Committee with an interim report on its ongoing investigation. IGI's tentative findings were summarized as follows:

> Based on the investigation to date, IGI found no examples of explicit misappropriation by Mr. Aramony of corporate assets. However, IGI did identify several areas in which Mr. Aramony apparently *received direct and indirect benefits due to inadequate procedures and systems.*

Pl.'s Ex. 177 at 3 (emphasis added). Specifically addressing allegations that Aramony misused UWA credit cards, personnel, and other resources, the report states that

> [b]ased on a review of documents and interviews, IGI identified instances in which UWA apparently paid for Mr. Aramony's personal expenses that remain to be reimbursed. In other instances Mr. Aramony and his office were diligent in reimbursing UWA for certain personal expenditures. IGI identified *apparently inadvertent procedural omissions* in the President's office and in the Finance Department that allowed some personal expenditures to go unreimbursed.... The failure to distinguish between Mr. Aramony's personal and UWA corporate finances has created the appearance and in some cases the reality, that UWA is underwriting Mr. Aramony's personal expenses.

*Id.* (emphasis added). The report then recommended a retroactive audit be conducted "to allow Mr. Aramony the opportunity to reimburse UWA for any personal expenses paid in error by UWA." *Id.* A second interim

report, dated February 13, 1992, contained language nearly identical to that of the February 3 report. *See* Pl.'s Ex. 178 at 3–4.

Thus, neither the February 3 nor the February 13 report disclosed the scope of Aramony's "creative coding." Rather, the reports informed the Executive Committee of "inadvertent procedural omissions" which resulted in some limited payments of Aramony's expenditures by UWA. Based on the content of these interim reports, the Executive Committee did not know that Aramony was engaged in the systematic miscoding of personal expenditures over an extended period of time.

### 2. *The Purchase of the Merlo Annuity*

In or about December 1990, UWA's outside auditors, Arthur Andersen & Company, became aware that UWA had purchased a $375,000 pension annuity for Merlo. *See* JPTO at ¶ 5(ggg); Walthall Tr. at 1391. Arthur Andersen immediately informed Larry Horner, Chairman of the Audit Committee of the Board of Governors, of this expenditure. *See id.* at ¶ 5(hhh).

On March 8, 1991, Aramony sent a letter to Akers concerning the Merlo annuity. *See* Pl.'s Ex. 104. The letter was copied to both Horner and Leffall. *See id.; see also* Walthall Tr. at 1503–4. Aramony's letter explained that he had established a supplemental pension for Merlo which would provide Merlo with an annuity after retirement; and, that Aramony had caused UWA to purchase a $375,000 annuity from Mutual to fund the pension. *See* Walthall Tr. at 1503–4. According to Aramony, Lisle Carter drafted the March 8, 1991 letter. In response to the letter, Akers, Leffall, and Horner expressed their support for the annuity purchase. *See* Aramony Tr. at 128, 132, 144. On July 25, 1991, UWA's Audit Committee held a meeting at which the topic of the Merlo annuity was discussed. *See* JPTO at ¶ 5(jjj); Pl.'s Ex. 102; Walthall Tr. at 1504. Based on the evidence presented at trial, I find that UWA's Board members were aware, by July 25, 1991, that Aramony had caused UWA to

purchase the $375,000 Merlo annuity.[12]

### 3. The Purchase of the Florida Condominium

On February 20, 1987, Mutual's Board of Directors approved the establishment of an endowment called the "William Aramony Initiative in Voluntarism." *See* Pl.'s Ex. 79. The grant announcement was made in April 1987 in Washington, D.C. during UWA's Centennial Celebration. *Id.* Mutual intended that the interest from the grant be distributed by Aramony at his discretion. *Id.*

The interest from Mutual's one million dollar grant was distributed to a restricted account at UWA and then allocated by UWA to VIA. *Id.* In 1990, VIA purchased a condominium in Florida at a cost of approximately $125,000. *See* JPTO at ¶ 5(bbb). On May 1, 1991, VIA sold the Florida condominium for $125,526.00.[13] *See id.* The sale proceeds are presently on deposit in VIA bank accounts. *See id.* at ¶ 5(ccc, ddd).

On February 24, 1992, UWA distributed a memorandum to its chief professional officers and communications directors, which addressed, *inter alia*, allegations that VIA money was improperly used to buy the Florida condominium. Attached to the memorandum was a document entitled "Talking Points," which defended VIA's purchase of the Florida condominium. *See* Pl.'s Ex. 79. The Talking Points document stated, in part, that

> [h]elping to create necessary infrastructure is important to ensuring effective services. As an example, VIA bought the Florida office to help give United Way International added presence in the area so it could better deal with volunteers and

issues involving Central and South America. *Id.*

Also attached to the February 24, 1992 memorandum was a "Fact Sheet" describing VIA. Apparently referring to the purchase of the Florida condominium, the Fact Sheet explained Aramony's near-total discretion over the VIA monies and stated that "[t]his use is totally consistent with [Mutual's] intent." *Id.* Based on this and other evidence presented at trial, I find that on or before February 26, 1992, UWA's Board members knew of VIA's purchase of the Florida condominium.[14]

### G. Government Investigations

In May 1992, the United States Attorney's Office for the Eastern District of Virginia began an investigation of UWA and Aramony. *See* Baerwald Tr. at 461. Initially, UWA was unaware of the scope of the investigation and was concerned that it might be a target. *See* Kolb Tr. at 536. Consequently, UWA retained the services of Verner Liipfert to provide guidance and to assist in gathering documents and responding to subpoenas. Kolb Tr. at 538–39. *See* Baerwald Tr. at 461–62. Verner Liipfert also represented UWA during the course of Aramony's criminal trial by providing counsel to UWA employees who were called as witnesses. *See* Kolb Tr. at 537–40.

UWA was also investigated by the Charities Bureau of the New York State Attorney General's office. *See id.* at 535, 547. UWA was again uncertain of the scope of the investigation, and thus retained Verner Liipfert to assist UWA in responding to that investigation. *See id.* at 548–49. In addition, UWA retained Weil Gotshal & Manges to provide counsel to Board members, in case a conflict

---

**12.** This conclusion is, of course, not inconsistent with the jury's conviction of Aramony for the fraudulent purchase of the Merlo annuity. It is undisputed that Aramony purchased the annuity without the advance approval of the Board of Directors, which was apparently required for such transactions. *See* Aramony Tr. at 208; Brennan Tr. at 1232–33. My finding of fact concerns only the Board's subsequent knowledge of the annuity purchase.

**13.** The condominium was sold to PUI, a Board-authorized spin-off company. *See* Walthall Tr. at 1500; Brennan Tr. at 1260.

**14.** This factual finding concerns UWA's knowledge after the condominium was purchased. Aramony does not dispute that he purchased the condominium without seeking the approval of UWA's Board of Governors, though he continues to claim that he was free to do so under the terms of the grant. *See* Aramony Tr. at 97, 203–05; *but see* Brennan Tr. at 1230–31.

arose between their position and that of UWA. *See* Kolb Tr. at 549. The Attorney General's investigation culminated in an "Assurance of Discontinuance" which UWA executed on December 28, 1995. *See* Pl.'s Ex. 145. The second paragraph of the Assurance indicates that the action against UWA was directed at "allegations concerning the administration, financial operations and governance of [UWA] to determine its compliance with the laws of [New York State] governing the administration of charitable assets." Pl.'s Ex. 169 at ¶ 1. The Assurance mandated institutional reforms to UWA, including revisions to its By-laws, expense policies, financial department, and the Board of Director's oversight mechanisms. *See id.* Additionally, the Assurance limited the benefits available to UWA's officers and senior managers, including the elimination of all existing non-qualified pension plans. *See id.* at p. 16.

On March 15, 1995, the New York Attorney General commenced an action against Aramony and Merlo in the Supreme Court, New York County, pursuant to New York Not–for–Profit Law § 720. *See Vacco v. Aramony*, No. 95–401592. The Complaint alleges that Aramony breached his fiduciary duties of care and loyalty to UWA when he improperly used UWA funds for his personal benefit and wasted UWA funds. *See* JPTO at ¶ 5(rr). This action is still pending. *Id.*

Finally, UWA was investigated by the I.R.S. to determine whether it was still entitled to the tax exemption for charitable organizations. *See* Kolb Tr. at 535, 551. UWA cooperated with the I.R.S. investigation with the assistance of Verner Liipfert. *See id.* at 551. UWA's tax status remained unchanged following the investigation. *Id.*

UWA created a "Special Fund for the Investigation" consisting of contributions from its Board members and their companies for the purpose of paying the legal fees that UWA was expected to incur as a result of these investigations. *See* JPTO at ¶ 5(*lll*). The Fund collected and disbursed approximately $1.5 million. *See id.*

H. *Media Coverage of the "Aramony Scandal"*

In February 1992, a number of articles appeared in the press discussing various improprieties committed by UWA, Aramony, and Merlo. Those articles most frequently criticized (1) UWA's relationship with spin-off organizations that were staffed with UWA officers, including Aramony; (2) Aramony's $390,000 annual salary and perks, including his use of chauffeured cars, first class air travel, the Concorde, and a trip to the Super Bowl; (3) Aramony's hiring of Merlo, his long-time friend, as UWA's CFO and other alleged cronyism in hiring; (4) VIA's purchase of the Florida condominium; and (5) UWA's obstruction of press investigations into its spin-offs.[15] These articles do not

**15.** *See, e.g.,* Jack Anderson, *Charity Begins at Home for United Way,* Edmond Evening Sun (Okla.), Feb. 12, 1992 (UWA's coercion of workers in raising money, UWA's obstruction of newspaper investigations, spin-offs' lack of accountability, salaries and perks at spin-offs); Charles E. Shepard ("Shepard"), *Perks, Privileges and Power in a Nonprofit World,* Wash. Post, Feb. 16, 1992, at A1 (discussing Aramony's salary; his rewarding of friends with jobs; his power in spin-off companies; his son's control over one spin-off; the use of PUI funds to decorate a New York City condominium; his UWA salary; his luxurious UWA office; his use of the Concorde, chauffeured cars, and first class travel; Aramony's Super Bowl trip; and Aramony's hiring of his friend Merlo as CFO) (illustrated by a chart comparing salaries of UWA officers to salaries of the heads of five charities and five trade organizations); *A Charitable Salary,* Wash. Post, Feb. 20, 1992, at A24 (editorial criticizing Aramony's high salary); Kathleen Teltsch, *Investigation Focuses on Salary, Conduct of United Way Official,* N.Y.

Times, Feb. 24, 1992, at A2 (discussing UWA's lavish spending and free-wheeling management practices; Aramony's salary; the misuse of spin-off money, including the purchase of a New York City apartment; Aramony's Super Bowl trip); Shepard, *Endowment Funds Bought Florida Condo,* Wash. Post, Feb. 24, 1992, at A9 (VIA's purchase of Florida condominium and sale to PUI, PUI's ownership of condominium in New York City); Shepard, *United Way's For–Profit Offspring,* Wash. Post, Feb. 24, 1992, at A1 (discussing spin-offs, especially power of Aramony and his friends on spin-offs' boards, PUI's purchase of real estate, Aramony's staffing spin-offs with unqualified personnel, role of Aramony's son in spin-offs, UWA's refusal to disclose financial information regarding its spin-offs, the failure of one spin-off and its bail-out by another); Shepard, *United Way of America President is Urged to Resign,* Wash. Post, Feb. 27, 1992, at A1 (discussing spin-offs); *United Way Hires Counsel to Examine Ties to Subsidiaries,* Wall St. J., Feb. 25, 1992, at A4 (discussing UWA's hiring of Ver-

focus on three of the key issues that are the subject of UWA's counterclaims—namely, Aramony's charging of personal expenditures to UWA, the Merlo annuity, and the $5,000 payment to Merlo. These articles do discuss the fourth charge—VIA's purchase of the Florida condominium. In fact, UWA itself bears much of the responsibility for most of the conduct described in the articles. For example, Aramony's salary and the establishment of the spin-offs, with the possible exception of VIA, were formally approved by the Board of Directors. Furthermore, UWA implicitly authorized Aramony's Concorde and chauffeured car use, first-class travel, and Super Bowl Trip. *See* Pl.'s Exs. 79, 82, 85.

## I. *UWA's Post–1991 Decline in Revenues*

UWA provides technical support and services to over 2,100 local community based organizations throughout the United States ("locals"). *See* Def.'s Ex. O at 7. Each local is an independent, separately incorporated entity, and is governed by a local board of volunteers. *See id.* United Way receives its revenues in the form of ·dues paid by the locals as a fixed percentage of the monies

they raise ("pledge percentage"). *See* Kolb Tr. at 552. Thus, the amount of UWA's annual revenues depends on two factors: (1) the amount of money raised by the locals, and (2) the percentage of that money pledged as dues to the UWA.

In the years immediately before the 1992 publicity and the years following the publicity, the locals raised the following revenues:

| YEAR | REVENUES |
| --- | --- |
| 1989 | $2.98 billion |
| 1990 | $3.11 billion |
| 1991 | $3.17 billion |
| 1992 | $3.04 billion |
| 1993 | $3.05 billion |
| 1994 | $3.08 billion [16] |

Prior to 1992, the locals were expected to contribute 1% of the monies they raised to UWA. However, in early 1992, UWA reduced that percentage, adopting a two-tiered dues percentage of .6% or .75%, depending on the level of services the local received from UWA. *See* Kolb Tr. at 552. As a consequence of the post–1991 decline in the locals' revenues and the pledge percentage, the locals' pledges in 1992, 1993, and 1994 were lower than they had been in 1991.[17] UWA,

---

ner Liipfert to investigate allegations of spin-off mismanagement and public criticism of Aramony's salary, travel expenses, and alleged cronyism in hiring); Felicity Barringer, *United Way Board Discusses Leader*, N.Y. Times, Feb. 27, 1992 (discussing Aramony's first-class air travel, VIA's purchase of the Florida condominium, Aramony's hiring of friends and associates); John H. Cushman, Jr., *Charity Leader's Success Was Also His Undoing*, N.Y. Times, Feb. 28, 1992, at A14 (discussing spin-offs, condominium purchases, salary, Concorde, limousines).

**16.** Adjusted for inflation, these revenue figures are:

| YEAR | REVENUES ADJUSTED FOR INFLATION |
| --- | --- |
| 1989 | $2.40 billion |
| 1990 | $2.38 billion |
| 1991 | $2.33 billion |
| 1992 | $2.17 billion |
| 1993 | $2.11 billion |
| 1994 | $2.08 billion |

These figures reveal that in inflation-adjusted dollars, the decline in the locals' revenues began in 1990, well before any newspaper articles were published.

Irwin Miller, Aramony's expert witness, nonetheless conceded that the revenue drop in 1992

was exceptional. Miller performed a regression analysis which he used to show that certain economic factors could account for most of the changes in the locals' revenues. *See* Pl.'s Ex. 202. But when he compared the results of his regression analysis to the inflation-adjusted revenues figures, Miller concluded that the difference between his regression analysis results and the revenues raised in 1992 was statistically significant—i.e., that the economic variables he had considered in his regression analysis could not themselves explain the revenue decline in 1992. *See* Testimony of Irwin Miller ("Miller Tr.") at 713–14, 729–30.

**17.** The locals pledged the following amounts to UWA:

| YEAR | LOCAL PLEDGE AMOUNT |
| --- | --- |
| 1991 | $23.92 million |
| 1992 | $17.62 million |
| 1993 | $16.83 million |
| 1994 | $17.47 million |
| 1995 | $18.64 million |
| 1996 | $18.64 million |

These pledges, however, do not reflect the amount actually collected by UWA because a certain percentage of dues pledged are not collected. Aramony testified that the "uncollecta-

of course, attributes this post–1991 decline in pledge revenues to Aramony's misconduct, which allegedly caused the public and locals to become disillusioned with the national organization.

## III. ARAMONY'S CLAIMS

### A. *Counts One and Two for Benefits Under the RBP*

Aramony asserts claims for recovery of his RBP benefits, pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1132(a)(1)(B), and for a declaration of his RBP pension rights, pursuant to 28 U.S.C. § 2201. These claims require resolution of the following issues: (1) whether Aramony forfeited his RBP benefits when he was convicted of felonies which victimized UWA; and (2) if he did not forfeit his rights, which benefits are owed to him under the RBP.

#### 1. *Forfeiture of Benefits Under the RBP*

█ Aramony contends that the Signed Plan, executed by Paulachak and containing a non-forfeiture provision, is the controlling plan document. UWA, on the other hand, argues that the Draft Plan, which contained a felony forfeiture provision, more accurately reflects the Board's intent in adopting the RBP.

Aramony's preferred document is, on its face, a binding plan document—it is a completed and signed document, while UWA's preferred document is merely a draft providing multiple-choices (boxes to be checked) and containing numerous blanks in which important information was to be added. The Signed Plan, not the incomplete draft, was disseminated to UWA employees as the RBP document and was signed by the employer.[18] *See* Aramony Tr. at 73. Thus, the Signed Plan is presumptively the governing plan document and UWA is assumed to be bound by its terms.

#### a. *Paulachak's Implied Authority*

UWA nevertheless argues that it is not bound by the Signed Plan's non-forfeiture provision because Paulachak lacked the authority to remove the felony forfeiture provision. Specifically, UWA argues that: (1) only the Executive Committee could adopt or modify a UWA pension plan; (2) the Execu-

---

bility rate" varied from local to local, ranging between three and twenty percent, depending on the economic health of the community in which the local operated. *See* Aramony Tr. at 673–675. Robert O'Conner, a supervisor in UWA's research division, testified that UWA audits had determined that the average uncollectability rate was between six and eight percent. *See* Testimony of Robert J. O'Connor ("O'Connor Tr.") at 682–84. Consequently, the $6.30 million fall in pledges which occurred between 1991 and 1992 would have resulted in a decline in UWA's revenues of between $5.80 million and $5.92 million.

**18.** The Signed Plan has all the indicia of a unilateral contract—a legally enforceable promise made by one party only. *See* 1 Arthur Linton Corbin, *Corbin on Contracts* § 21 (1960). Several courts have interpreted top-hat plans as unilateral contracts. *See e.g., In re New Valley Corp.,* 89 F.3d 143, 150–51 (3d Cir.1996); *Kemmerer v. ICI Americas, Inc.,* 70 F.3d 281, 287 (3d Cir. 1995); *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1487–88 (N.D.Cal.1993). The Second Circuit has not yet ruled directly on this issue while it was recently addressed in *dicta,* in *Gallione v. Flaherty,* 70 F.3d 724 (2d Cir.1995). In that case, the lower court analogized a top-hat plan to a welfare benefit plan, because both are exempt from ERISA's vesting requirements. It held that because the Second Circuit had previously decided that a welfare benefit plan is not a unilateral contract, the same would be true for a top-hat plan. *See id.* at 726–27. The Second Circuit disagreed. Citing its earlier holding in *Reichelt v. Emhart Corporation,* 921 F.2d 425 (2d Cir.1990), it noted that the reason that a welfare benefit plan is not a unilateral contract is that the preemption doctrine would not permit contract law to create a vested right which ERISA specifically exempts. The court went on to note that a top-hat plan, by contrast to the welfare benefit plan, is designed for senior executives who are able to negotiate "arrangements that protect against the diminution of their expected pensions." *Id.* at 728. Executives' ability to negotiate for terms that will protect their interests implies that an executive may negotiate enforceable contract rights. *Id.* at 729. The court concluded that "we are skeptical of the proposition that if such an employee has no viable pension claim under ERISA he necessarily also has no enforceable right to a pension pursuant to a contract." *Id.* at 729. This conclusion leads me to believe that when the Second Circuit squarely addresses the issue, it will join with the Third Circuit in concluding that a top-hat plan is a unilateral contract. In addition, I note that Aramony had a vested interest in this RBP for two reasons: (1) his rights in the underlying pension plan were fully vested; and (2) the RBP contained a non-forfeitability clause.

tive Committee adopted the provisions of the Draft Plan, including its felony forfeiture provision; and thus (3) Paulachak was not authorized to sign a plan that did not include this provision.

In light of the fact findings set forth above, UWA's argument must be rejected. The Executive Committee did not adopt the details of the Draft Plan. Rather, the Committee approved the concept of an RBP and authorized UWA to establish a plan that would make up the benefits lost by key employees as a result of § 415 and Rev. Rul. 80–359. The Committee intended that Paulachak would arrange the plan details with Mutual.[19] Thus, Paulachak was authorized to bind UWA to the Signed Plan, although some of its terms differ from those of the Draft Plan. *See 99 Commercial Street, Inc. v. Goldberg,* 811 F.Supp. 900, 906 (S.D.N.Y. 1993) (under New York law, "[a]n agent enjoys implied authority to enter into a transaction when verbal or other acts by a principal reasonably give the appearance of authority to the agent.") (citing *Greene v. Hellman,* 51 N.Y.2d 197, 433 N.Y.S.2d 75, 80, 412 N.E.2d 1301 (1980)). The RBP was signed by Paulachak on behalf of UWA. It is a fundamental principle of contract law, that:

> [O]ne who signs his name to a writing that purports to be a contract does an act that is strong evidence that he intends to make himself a party thereto, bound as a promisor and entitled as a promisee. Even if he does not so intend, the principles of estoppel may bind him notwithstanding.

1 *Corbin* § 31. A contract signed by a party is valid and binding on it. *Id.*

### b. *Ambiguity in the Signed Plan*

■ UWA further argues that the Signed Plan cannot be the controlling plan document because, as written, its benefit formulae would not provide the plan's participants with any benefits. The Signed Plan's benefit formulae define the annual contributions that UWA must make to the Plan so as to offset the effect of certain tax restrictions on the contributions made to the participants' defined contribution plans. However, none of the RBP's participants—indeed, nobody at UWA—was enrolled in a defined contribution plan because UWA's qualified pension plan was a defined benefit plan to which no contributions were made.

■ UWA is correct in noting that the Signed Plan's benefit formula, on its face, would not require the payment of any benefits. However, as this Court explained in an earlier opinion, "the provisions of an ERISA plan should be construed so as to render all provisions meaningful and to avoid illusory promises." *Aramony I,* 1997 WL 732447, at *5 (citing *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1493 (N.D.Cal.1993)). Accordingly, "the total absence of benefits for the [Signed Plan's] beneficiaries renders the [benefit] formula ambiguous on its face." *Aramony I,* at *5.

■ It is generally accepted that ambiguities in contract terms are construed against the drafter. *See e.g., Kerin v. United States Postal Service,* 116 F.3d 988, 992 (2d Cir.1997). If a provision of the contract is ambiguous, extrinsic evidence may be considered to ascertain the actual intention of UWA. *See Cinelli v. Security Pacific Corp.,* 61 F.3d 1437, 1444 (9th Cir.1995); *Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 29 (1st Cir.1991). Where the meaning of a contractual provision is unambiguous, it is appropriate to presume that the natural meaning is conclusive evidence of UWA' intent. *Id.* The fact that one provision of a contract is ambiguous does not invalidate the entire document.

As such, it is appropriate to consider extrinsic evidence that is probative of UWA's

---

19. Indeed, the evidence at trial showed that UWA plainly believed that the Signed Plan, not the Draft Plan, governed the RBP. In an October 7, 1993 letter to UWA, Aramony claimed that he was entitled to benefits under both the RBP and the SBA and requested copies of "pension plan calculation data" and "completed plan documents." Pl.'s Ex. 46; Tr. at 94. More than six months later, Debra Gittens, UWA's Vice–President for Human Resources, responded to Aramony's request with a letter dated April 11, 1994. Gittens wrote that she had enclosed "copies of the documents which we believe you requested in your October 7, 1993 letter." Pl.'s Ex. 43; Tr. at 93–94. The RBP plan document that Gittens enclosed was the Signed Plan. *See* Pl.'s Ex. 43; Tr. at 94.

intent regarding RBP benefit calculations. *See Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (citing *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990)). It is undisputed that UWA's intent in adopting the RBP was to replace benefits that could not be paid under UWA's qualified defined benefit pension plan as a result of limitations imposed by the I.R.C. More specifically, the Executive Committee approved the concept of an RBP that would replace the benefits lost as a result of § 415 and Rev. Rul. 80–359. Consistent with this intent, the Signed Plan's ambiguous benefit formula must be interpreted as offsetting the effects of § 415 and Rev. Rul. 80–359 on the RBP participants' defined benefit plans.[20] Accordingly, I reject UWA's argument that the Signed Plan's references to a defined contribution plan render the document ineffective.

All parties here agree that UWA intended the RBP to be a defined *benefit* plan, not a defined *contribution* plan. The one-word mistake, which would result in the total absence of benefits for the Signed Plan's beneficiaries, then, is akin to a scrivener's error. When such an error occurs, courts typically enforce the parties' agreement or understanding. *See* 3 *Corbin* § 608. Thus, "if the actual intention of the parties can be and is determined, [the mistake] disappears as a reason for refusing enforcement." 1 *Corbin* at § 95. Thus, UWA cannot exploit this error to avoid enforcement of the defined benefit pension plan.

UWA argues that if the intent of UWA's Executive Committee is considered relevant to the meaning of RBP's benefit formula, then the Committee's intent is also relevant to determining whether RBP benefits are forfeitable. As stated above, however, an examination of extrinsic evidence is appropriate only where the terms of a contract are ambiguous. *See Cinelli,* 61 F.3d at 1444; *Bellino,* 944 F.2d at 29. Where the meaning of a provision is unambiguous, I presume its natural meaning to be conclusive evidence of

UWA's intent. *Id.* The forfeiture provision of the Signed Plan provides that "[t]he participant's rights under this Plan shall become nonforfeitable upon termination of employment." Pl.'s Ex. 1 at § 4.01. The only reasonable interpretation of this provision is that once Aramony was terminated, his rights became nonforfeitable, irrespective of the reason for his termination. Consequently, this provision must be interpreted as written, rather than through an analysis of the UWA's intent.

### c. *Conclusion*

In summary, UWA is bound by Paulachak's signature on the Signed Plan drafted by Mutual, as the Executive Committee authorized Paulachak to draft the RBP with Mutual. Because the Signed Plan's benefit formulae are ambiguous, they must be interpreted according to the clear intent of UWA's Executive Committee—that is, to make up for the effect of § 415 and Rev. Rul. 80–359 on UWA's qualified benefit plan. The non-forfeiture provision of the Signed Plan, however, is not ambiguous, and thus can be interpreted without reference to extrinsic evidence. Pursuant to that provision, Aramony's benefits under the Signed Plan became non-forfeitable on March 16, 1992, the date of his termination.

### 2. *Amount of Aramony's Benefits Under the RBP*

The parties also dispute the amount of benefits to which Aramony is entitled under the RBP. Aramony argues that he is entitled to RBP benefits that compensate for the effects on his defined benefit plan of § 415 and Rev. Rul. 80–359, as well as the effects of the Social Security integration rules of the Tax Reform Act of 1986 ("TRA") and I.R.C. § 401(a)(17). UWA concedes that the RBP was intended to compensate for the reduction in qualified plan benefits caused by § 415 and/or Rev. Rul. 80–359, but disputes that the RBP was intended to offset the effects of any other tax law provisions. *See* JPTO at ¶ 5(n).

---

**20.** When Saul Chandler, a Mutual pension actuary, made RBP benefit calculations for UWA, he interpreted the Signed RBP as compensating for

the effect of tax law provisions on UWA's defined *benefit* plan. *See* Pl.'s Exs. 3–11.

### a. Offsetting the Effect of the Tax Reform Act

In 1990, UWA's Board passed a resolution amending the RBP so as to offset for the effect of the TRA's Social Security integration rules on UWA's qualified benefit plan. Although no written amendment was ever drafted, the amendment was nevertheless effective.

Section 9.03 of the Signed RBP provides that UWA's Board may amend the terms of that plan. Where a benefit plan includes a procedure for amendment and this procedure is followed and recorded in the minutes of a Board meeting, the resulting amendments are effective, despite the absence of a written plan amendment. *See Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 105 (3d Cir.1990). Accordingly, Aramony is entitled to benefits that offset the effects of the TRA's Social Security integration rules on his defined benefit plan.

### b. Offsetting the Effect of § 401(a)(17)

Aramony asserts that he is also entitled to RBP benefits that offset the effect of I.R.C. § 401(a)(17), a tax law provision enacted in 1986, which reduced the § 415 make-up benefits of highly-compensated RBP participants.[21] Aramony argues that UWA is estopped from denying him benefits that would offset the effect of § 401(a)(17) because he relied to his detriment on Mutual's representations that he would receive such benefits.

The elements of a promissory estoppel claim in an ERISA action are: (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced. *See Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 78–80 (2d Cir.1996); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136–37 (2d Cir.1994); *accord Curcio v. John Hancock Mutual Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994). Moreover, to prevail on a claim of equitable estoppel in the ERISA context, the plaintiff must generally prove the existence of "extraordinary circumstances." *Schonholz*, 87 F.3d at 78; *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993).

The representations at issue here were contained in two reports, dated October 1988 and January 1989, which calculated Aramony's pension benefits and were prepared on UWA's behalf by Mutual ("Benefit Estimates"). *See* Pl.'s Exs. 12, 13. According to these estimates, Aramony would be entitled to a lump sum of $2,260,099 under the RBP if he retired at age 62 (in 1989) and $2,901,778 if he retired at age 65 (in 1992). The magnitude of these figures reveals Mutual's belief that Aramony's RBP benefits would make up for the effect of § 401(a)(17) on Aramony's defined benefit plan. Indeed, the parties agree that without a § 401(a)(17) make-up provision, Aramony's RBP benefits would fall by more than fifty percent, from $3,221,057 [22]

---

**21.** Benefits are calculated under UWA's qualified defined benefit plan by multiplying a fixed ratio by salary (a five-year average) and multiplying the result by years of service. Effective after January 1, 1988, § 401(a)(17) caps the amount of salary that may be used in this formula ($200,000, adjusted for inflation) to calculate qualified benefits. Thus, for example, if in 1988, an employee earned $300,000 in salary, one-third of her salary ($100,000) would be excluded from the calculation of her benefits under the qualified plan, reducing her qualified benefits by a third.

However, § 415 caps an employee's total benefits at approximately $100,000. Thus, although in theory, § 401(a)(17)'s salary cap might reduce a hypothetical employee's benefits under her qualified benefit plan by one-third, from $1 million to $667,000, in practice, the employee's benefits under the qualified Plan would remain unchanged at $100,000 as a consequence of § 415.

Section 401(a)(17) would nevertheless have a profound effect on the benefits of highly paid employees participating in an RBP. Before § 401(a)(17) became effective in 1988, UWA's RBP made up the difference between the benefits paid under UWA's qualified plan and $100,000 (the § 415 limit). Taking the hypothetical figures given above, the § 415 make up benefit would equal $900,000 ($1 million—$100,000). However, once § 401(a)(17) became effective, the employee would be entitled to only $567,000 ($667,000—$100,000) in § 415 make-up benefits, far less than her RBP benefits before 1988. If, however, the RBP were interpreted as offsetting the effect of § 401(a)(17), then plan participants would be entitled to the amount of benefits that UWA's Executive Committee anticipated paying out, and UWA's employees anticipated receiving, when the RBP was enacted in 1985.

**22.** This $3,221,057 figure, calculated by Alan Jacobs, Aramony's expert witness, and stipulated to by UWA, is consistent with Mutual's $2,901,778 calculation in the two benefit estimate reports.

to $ 1,497,267—far below Mutual's RBP benefit estimate for Aramony's 1992 retirement. Thus, through its agent, UWA represented to Aramony that the RBP would compensate for the effect of § 401(a)(17) on his qualified benefit plan.[23]

On December 1991, Aramony entered into a divorce settlement with his wife. *See* Aramony Tr. at 91; Pl.'s Ex. 50. As part of that settlement, Aramony assigned the benefits of his qualified pension plan to his wife. *See* Aramony Tr. at 92; Pl.'s Ex. 50. In doing so, Aramony relied on his expectation that he would receive the money from the RBP, as calculated in Mutual's Benefit Estimates. *See* Aramony Tr. at 86–90, 92. Aramony therefore relied to his detriment on Mutual's representations concerning his benefits.

Under the unique circumstances of this case, permitting UWA to withhold benefits that compensate for the effect of § 401(a)(17) would be unjust. Here, the Signed Plan was ambiguous as to whether it was intended to compensate for the effects of § 401(a)(17).[24] What renders the plan document ambiguous on this issue is the plan's expressly stated purpose. Article I of the Signed Plan document, entitled "Purpose of the Plan," states as follows:

> This Plan is being installed to provide a mechanism for securing the benefit promises made to its management and highly compensated key employees who may receive relatively smaller retirement benefits under the existing pension arrangement than rank and file employees will receive as a result of limitations imposed by the Internal Revenue Code and rulings there-

under on the amount of pensions payable to the highly compensated.

Pl.'s Ex. 1 at 1. As already noted, the effect of § 401(a)(17), which became effective in 1988, was to reduce the § 415 make-up benefits of highly-compensated RBP participants. This result—an unanticipated windfall for UWA and an unexpected loss of pension benefits for RBP participants—directly contravenes the plan's stated purpose of securing the pension benefits promised by UWA to its key employees. This conflict between the plan's stated purpose and the effect of § 401(a)(17) renders the Signed Plan ambiguous on the question of whether it provides for § 401(a)(17) make-up benefits. *See generally Sayers*, 7 F.3d at 1095 (ambiguity exists if agreement is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the entire context of the entire integrated agreement"); *see also Bradwell v. GAF Corp.*, 954 F.2d 798 (2d Cir.1992) (interpreting ERISA plan based on explicit purpose set forth in plan document).

In 1985, the Signed Plan promised Aramony certain benefits, and then, after 1988, Mutual's benefit estimates indicated that these benefits would not be reduced by § 401(a)(17). Given these facts, as well as the ambiguity of the Signed Plan, it would be particularly unjust to deny Aramony the § 401(a)(17) make-up benefits that he relied on as post-retirement income.

These same facts, especially the Signed Plan's ambiguity, satisfy the "extraordinary circumstances" requirement which applies in

The difference between the figures is attributable to Jacobs' use of a different mortality table than was used by Mutual, his use of a slightly different cost of living adjustment, and the effect of Aramony's termination on March 16, 1992, rather than the December 31, 1991 date assumed in Mutual's calculation. *See* Pl.'s Ex. 55 at 7.

**23.** UWA was plainly aware that Mutual had interpreted the RBP as compensating for the effect of § 401(a)(17). The Annual Valuation Reports that Mutual prepared for UWA between 1988 and 1991 explicitly stated that Mutual had taken into consideration the effect of § 401(a)(17) on the RBP. *See* Pl.'s Exs. 7–11. The reports also contained benefit figures that were consistent

with a § 401(a)(17) make-up benefit. *See id.;* Testimony of Robert Sadler ("Sadler Tr.") at 324–25. Finally, Robert Sadler, the former head of Mutual's branch office that handled the UWA account, testified that at an April 28, 1992 meeting, he informed UWA personnel of Mutual's understanding that the RBP compensated for qualified benefits that were lost as a result of § 415, Rev. Rul. 80–359, *and* § 401(a)(17). *See* Sadler Tr. at 335–37.

**24.** The absence of any mention of § 401(a)(17) from the Signed Plan, is not, of course, determinative of the RBP's scope. That plan was signed in 1985, one year before Congress enacted § 401(a)(17).

ERISA actions.[25] *See, e.g., James v. New York City Dist. Council of Carpenters' Benefits Funds,* 947 F.Supp. 622 (E.D.N.Y.1996) ("extraordinary circumstances" requirement satisfied where representations are made concerning the interpretation of ambiguous plan language). Aramony is therefore entitled to RBP benefits that make up for the effect of § 401(a)(17) on his qualified benefit plan.

### 3. *Summary of Aramony's Claim for Benefits Under the RBP*

Aramony is entitled to RBP benefits that compensate for the effects of (1) § 415, (2) Rev. Rul. 80–359, (3) the Social Security integration provision of the 1986 TRA, and (4) § 401(a)(17), on his qualified defined benefit plan. The parties have stipulated that these make-up benefits total $3,221,057. JPTO at 5(q).

### B. *Counts Five and Six Seeking Benefits Under the SBA*

Aramony also seeks to recover the SBA benefits that accrued from January 1, 1985 until the termination of his employment, pursuant to ERISA § 502(a)(1)(B), and a declaration of his SBA pension rights, pursuant to 28 U.S.C. § 2201. In its defense, UWA argues that Aramony forfeited any benefits under the SBA by repeatedly defrauding the organization. The SBA, unlike the RBP, does not contain a provision that would preclude the forfeiture of benefits; rather, the agreement is silent on the issue of benefit forfeiture. *See Aramony I,* 1997 WL 732447, at *7.

### 1. *Forfeitability*

ERISA generally establishes certain minimum requirements that covered pension plans must satisfy, including requirements for non-alienability and non-forfeitability, or "vesting." *See* 29 U.S.C. §§ 1051 *et seq.* However, ERISA specifically excludes "top-hat" plans, like UWA's SBA, from its vesting provision. *See* 29 U.S.C. § 1051(2). Under the federal common law of forfeiture, which is derived from the consensus approach of state courts, employees cannot recover non-vested pension benefits that accrued during periods of disloyalty. *See Aramony II,* 1998 WL 205331, at *9–11. Aramony is therefore barred from recovering benefits which accrued during the period in which he defrauded UWA.

Based on Aramony's criminal convictions, I have found that he defrauded UWA by intentionally miscoding personal expenditures as business expenses from September 1989 until December 1991. In addition, I found that Aramony fraudulently caused UWA (1) to issue a $375,000 annuity to Merlo, (2) to make an unjustified $5,000 payment to Merlo, and (3) to purchase a $125,000 condominium in Florida. Based on the testimony of witnesses in Aramony's criminal trial, I further found that his intentional miscoding of personal expenditures occurred regularly, beginning in 1982.

### 2. *Waiver*

In the face of these compelling facts, Aramony argues that UWA cannot withhold his SBA benefits because it waived its right to do so. According to plaintiff, this waiver occurred at two Executive Committee meetings in February 1992: On February 3, 1992, when the Executive Committee gave Aramony a unanimous vote of confidence, and then on February 26, 1992, when the Committee rejected Aramony's offer to resign, asking him to continue at UWA until a successor

---

**25.** Courts created the "extraordinary circumstances" requirement out of their concern that the liberal application of the equitable estoppel doctrine in the ERISA context might impose obligations on pension funds that would threaten their "actuarial soundness." *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2d Cir.1985) (quoting *Phillips v. Kennedy,* 542 F.2d 52, 55 n. 8 (8th Cir.1976)). UWA's contributions to the account which funded the RBP, however, were based on Mutual's Actuarial Valuation Reports which assumed that the RBP provided § 401(a)(17) make-up benefits. *See* Pl.'s Exs. 34, 53; Aramony Tr. at 187–88. Because application of the equitable estoppel doctrine does not compromise the RBP's fiscal integrity, the doctrine would apply even if the circumstances of this case were not so "extraordinary." In addition, the "extraordinary circumstances" doctrine might not be applicable because it may not fall under those sections of ERISA that apply to top-hat plans. *Cf. In re New Valley Corp.,* 89 F.3d 143, 152–53 (3d Cir. 1996) (applying doctrine to top-hat plan).

could be found, and reaffirmed its vote of confidence in him.

 Under the federal common law doctrine of waiver, an employer who knows of an employee's misconduct may waive its right to withhold payment of that employee's top-hat pension benefits through conduct that is inconsistent with an intent to discharge the employee. *See Aramony II*, 1998 WL 205331, at *8, 11. The Executive Committee's conduct at the February meetings evinced a clear intent not to terminate Aramony. Indeed, the Committee's two votes of confidence, its express rejection of Aramony's resignation offer, and its request that Aramony continue his employment at UWA reveal that UWA's Executive Committee enthusiastically supported Aramony's continued employment.[26] The question, then, is whether, in February 1992, the members of the Executive Committee knew the nature and scope of Aramony's misconduct.

As I have found above, the members of the Executive Committee knew by February 26, 1992 that Aramony had caused UWA to purchase both the Merlo annuity and the Florida condominium. Although they also knew that Aramony had charged UWA for some personal expenses, they were informed at the time that these charges were the result of "apparently inadvertent procedural omissions." Pl.'s Ex. 177 at 3.

Thus, the Committee members were not aware that Aramony had regularly miscoded personal expenditures with the intent of defrauding UWA. Moreover, Aramony presented no evidence that by February 26, 1992, the Executive Committee knew that he had fraudulently caused UWA to make an unjustified $5,000 payment to Merlo. Because the Committee members knew neither the nature nor the scope of Aramony's miscoding or the fact of the $5,000 Merlo payment, they could not have knowingly waived any of UWA's rights arising from this misconduct. Accordingly, UWA did not waive its right to withhold Aramony's SBA benefits based on his intentional miscoding of personal expenditures or the $5,000 payment to Merlo.

### 3. *Conclusion*

Because Aramony prepared fraudulent expense reports throughout the entire period that his SBA benefits were accruing, he cannot recover any of the $308,757.39 that accrued under that pension plan.

### C. *Count Seven for Breach of Employment Agreement*

 Aramony claims that UWA breached the Employment Agreement by refusing to pay his salary after March 15, 1992 and seeks to recover salary for the remaining term of the contract. UWA, of course, argues that it was entitled to terminate Aramony as a result of his misconduct.

 Every contract includes an implied duty of good faith and an employee breaches that duty when she engages in acts of disloyalty. *See Western Electric Co. v. Brenner*, 41 N.Y.2d 291, 392 N.Y.S.2d 409, 411, 360 N.E.2d 1091 (1977) (by accepting bribes, employee breached duty of good faith implied in his employment contract); *see generally Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992). In addition, the Employment Agreement expressly requires that Aramony "serve the Corporation faithfully." Pl.'s Ex. 65 at ¶ 2. Thus, Aramony's fraudulent billing of personal expenses, as well as his other fraudulent conduct, constitutes a material breach of both his express and his implied contractual duties.

Aramony again argues that UWA waived its right to withhold performance of its contractual obligation to pay his salary when the Executive Committee expressed its support for him in 1992. Aramony's waiver argument is unavailing for the reasons explained above: The Executive Committee members did not know either that Aramony had regularly miscoded personal expenditures with the intent of defrauding UWA or that he had fraudulently caused UWA to make a $5,000 payment to Merlo. As a result, UWA did not breach the Employment Agreement by terminating Aramony. His claim for compensation under that agreement is therefore rejected.

**26.** The Board, of course, reversed its position three weeks later when it terminated Aramony.

D. *Count Eight for Breach of Agreement to Reimburse Fees and Costs*

Aramony contends that UWA agreed to reimburse him for the legal fees and costs that he incurred in negotiating a resolution to the dispute over pension benefits. As a result, he seeks to recover the cost of his legal fees from UWA. This claim is rejected based on my finding that UWA never agreed to reimburse Aramony for these fees.

E. *Count Ten for Unjust Enrichment*

Neither Aramony's Pre–Trial Brief nor his Proposed Findings of Fact and Conclusions of Law mentions Count Ten of the Amended Complaint, which asserts a claim for unjust enrichment. There are two possible theories under which Aramony may have intended to proceed. If Aramony's claim concerns his pension benefits, then it is preempted by ERISA. *See* 29 U.S.C. § 1144(a); *see also Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir.1994); *Morales v. Pan American Life Ins. Co.*, 914 F.2d 83, 87 (5th Cir.1990). On the other hand, if the claim is directed toward UWA's alleged promise to reimburse his legal expenses, the claim fails because UWA was not enriched by the services of Aramony's attorney. *See Nakamura v. Fujii*, 677 N.Y.S.2d 113, 116 (1st Dep't 1998) (essential element of unjust enrichment claim is that plaintiff conferred a benefit upon defendant); *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8, 12–13 (1st Dep't 1998) (same); *accord Nossen v. Hoy*, 750 F.Supp. 740, 744–45 (E.D.Va. 1990) (same) (applying Virginia law); *Po River Water and Sewer Co. v. Indian Acres Club of Thornburg, Inc.*, 495 S.E.2d 478, 482 (Va. 1998) (same).

F. *Count Twelve for Breach of Duty of Good Faith and Fair Dealing*

Aramony's trial submissions also fail to mention Count Twelve of the Amended Complaint, which asserts a claim for breach of duty of good faith and fair dealing. As pled in the Amended Complaint, this claim appears to be premised on UWA's duty of good faith and fair dealing arising under both the Employment Agreement and UWA's alleged agreement to reimburse Aramony's legal fees. Accordingly, this claim is duplicative of Counts Seven and Eight of the Amended Complaint and must therefore be dismissed. *See Fasolino Foods,* 961 F.2d at 1056 (parties to express contract are bound by an implied duty of good faith, "but breach of that duty is merely a breach of the underlying contract"); *Village On Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 534 (S.D.N.Y. 1996) (breach of good faith and fair dealing claim does not provide independent basis for recovery); *Centre–Point Merchant Bank Ltd. v. American Express Bank Ltd.,* 913 F.Supp. 202, 209 (S.D.N.Y.1996) (same).

G. *Count Thirteen for Reformation of Agreements*

Count Thirteen of the Amended Complaint, which asserts a claim for reformation, is yet another claim that was not mentioned in Aramony's pre-trial submissions. The Amended Complaint states that:

> In the event the Court determines that either the Replacement Benefit Plan, the Supplemental Benefit Agreement or the Employment Agreement do not provide the benefits to the plaintiff described herein, such failure is the result of mutual mistake on the part of UWA and the plaintiff and/or unilateral mistake on the part of the plaintiff and fraud on the part of UWA, and the agreements should be reformed to reflect the true intent of the parties as set forth herein.

Amended Complaint at ¶ 98.

While the Signed Plan's reference to a defined contribution plan rather than a defined benefit plan was a mistake, reformation would lead to the same result that was reached above—an interpretation of the plan that conforms with the parties' intent. With respect to the SBA and Employment Agreement, Aramony fails to suggest how these agreements were the result of mutual mistake or in what manner UWA perpetrated a fraud. His claim for reformation is therefore rejected.

H. *Prejudgment Interest*

Both prejudgment interest and attorneys' fees are governed by ERISA en-

forcement provisions. *See Black v. Bresee's Oneonta Dept. Store Sec. Plan,* 919 F.Supp. 597, 602, 604 (N.D.N.Y.1996). It is well established that "ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest." *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984); *Connecticut Gen. Life Ins. Co. of New York v. Cole,* 821 F.Supp. 193, 202 (S.D.N.Y.1993) (" 'The question of whether interest is to be allowed, and also the rate of computation, is a question of federal law where the cause of action arises from a federal statute.' ") (quoting *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1218 (8th Cir.1981)). For more than seven years, UWA has deprived plaintiff of the opportunity to use or invest his pension benefits.[27] Aramony is therefore entitled to prejudgment interest as such an award is "fair, equitable, and necessary to compensate [him] fully." *Wickham Contracting Co., Inc. v. Local Union No. 3, IBEW,* 955 F.2d 831, 835 (2d Cir.1992). Two questions remain: (1) the date on which interest begins to accrue; and (2) the appropriate rate of interest.

Courts have considerable latitude in both areas. I find that March 16, 1992 is the date on which interest should begin to accrue because that is when plaintiff became entitled to receive his pension benefits. *See Agro v. Joint Plumbing Indus. Bd.,* 623 F.2d 207, 211 (2d Cir.1980) (prejudgment interest awarded dating back to the due date of each monthly pension payment); *Valle v. Joint Plumbing Indus. Bd.,* 623 F.2d 196, 207 (2d Cir.1980) ("[T]he district judge here may have deemed it appropriate in all the circumstances to award the plaintiffs interest from the dates on which the respective pension applications were rejected. Had he done so, we would have found him to have acted well within the bounds of his discretion.").

While ERISA is silent on the issue of prejudgment interest, district courts have discretion in deciding what interest rate to apply. *See Connecticut Gen.,* 821 F.Supp. at 202. Moreover, " '[t]he Second Circuit has

not expressly endorsed any particular prejudgment interest rate.' " *Id.* (quoting *Cefali v. Buffalo Brass Co. Inc.,* 748 F.Supp. 1011, 1025 (W.D.N.Y.1990)). "In exercising this discretion, courts have relied on the Treasury rate as a fair measure of the cost of money over the relevant time period." *McLaughlin v. Cohen,* 686 F.Supp. 454, 458 (S.D.N.Y. 1988) (citations omitted). Accordingly, I accept plaintiff's proffered interest computation using the three-month T–Bill discount rate, which calculates interest through September 15, 1998. *See* Affidavit of Alan Jacobs, plaintiff's pension expert, dated September 28, 1998, at 2. Adjusting that calculation to include prejudgment interest through October 15, 1998, results in a prejudgment interest award of $1,177,121.39. *Id.* at ¶ 2.

## I. *Attorneys' Fees*

The decision whether to award attorneys' fees lies within the discretion of the district court. *See Fase v. Seafarers Welfare and Pension Plan,* 589 F.2d 112, 116 (2d Cir.1978); *see also* 29 U.S.C. § 1132(g)(1) ("In any action under this subchapter . . . , the court in its discretion may allow reasonable attorneys' fees and costs of action to either party."). Generally, the decision is based on the following five factors:

(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987) (citing *Ford v. New York Central Teamsters Pension Fund,* 506 F.Supp. 180, 183 (W.D.N.Y.1980), *aff'd per curiam,* 642 F.2d 664 (2d Cir.1981)).

Here, application of the five factors mandates a denial of an award of attorneys'

---

**27.** By the same token, UWA retained those funds which presumably grew at reasonable investment rates.

fees. In light of UWA's non-frivolous legal arguments, I cannot find that it acted in bad faith or with an unusual degree of culpability in withholding Aramony's pension benefits. Factor one cuts in favor of UWA. Given UWA's multimillion dollar revenue stream, it cannot be disputed that factor two favors Aramony. With respect to factor three, it is unlikely that an award of attorneys' fees would deter an employer with non-frivolous legal arguments from challenging the pension rights of an employee that defrauded it. *Cf. Park South Hotel Corp. v. New York Hotel Trades Council and Hotel Assoc. of New York City, Inc.*, 715 F.Supp. 596, 598 (S.D.N.Y.1989) (court declined to award attorneys' fees to employer, finding award not "justified on the ground of deterrence."). Moreover, the significant award of prejudgment interest serves as sufficient deterrent. *See Connecticut General*, 821 F.Supp. at 204. On balance, factor three favors UWA. Factor four necessarily favors Aramony, since his position has been proven to be more meritorious than that urged by UWA. Factor five is not applicable here. In short, while the factors are evenly split, the totality of the circumstances favors UWA. Accordingly, Aramony's application for an award of attorneys' fees is denied.

### J. Summary of Aramony's Claims

Aramony is entitled to $3,221,057 in benefits under the RBP, which contains a non-forfeiture provision. However, in light of his regular practice of improperly charging personal expenditures to UWA, which commenced as early as 1982, Aramony is not entitled to any benefits under the SBA.

Plaintiff's claim for compensation under the Employment Agreement is rejected be-cause Aramony breached that agreement by regularly charging personal expenditures to UWA and fraudulently causing UWA to pay $5,000 to Merlo. Nor is Aramony entitled to recover under UWA's alleged agreement to pay his legal fees in the Panel Process because no such agreement existed. All of Aramony's other claims, except for his application for prejudgment interest, are also rejected, for the reasons set forth above. In total, plaintiff is entitled to $4,398,178.39, which includes a prejudgment interest award of $1,177,121.39.

## IV. UWA'S COUNTERCLAIMS

UWA asserts counterclaims for: (1) breach of common law fiduciary duty (Count Four); (2) breach of fiduciary duty of loyalty under New York Not-for-Profit Law § 720 (Count Five); (3) breach of the Employment Agreement (Count Two); and (4) breach of the covenant of good faith and fair dealing (Count Three).

### A. Count Four for Breach of Common Law Fiduciary Duty

#### 1. Liability

■■■ Aramony previously challenged UWA's breach of fiduciary duty claim on the ground that it was barred by the applicable statute of limitations. This argument, however, was rejected because the limitations period is governed by N.Y. C.P.L.R. § 213–b,[28] which provides a crime victim seven years to assert claims against its malefactor. *See Aramony v. United Way of America*, 969 F.Supp. 226, 233–34 (S.D.N.Y.1997). Accordingly, UWA may recover damages only for that conduct which occurred after May 24, 1989 and for which Aramony was convicted.[29]

---

**28.** Section 213–b provides as follows:

Notwithstanding any other limitation set forth in this article . . . an action by a crime victim, or representative of a crime victim, . . . may be commenced to recover damages from a defendant convicted of a crime which is the subject of such action, for any injury or loss resulting therefrom within seven years of the date of the crime.

N.Y. C.P.L.R. § 213–b.

**29.** The statute of limitations on UWA's counterclaims is measured from the date that Aramony filed his Complaint—May 24, 1996. *See Aramo-*

*ny II*, 1998 WL 205331, at *3–4. Absent the seven-year period provided by § 213–b to crime victims, UWA's breach of fiduciary duty claim would have been limited by either New York's six year statute of limitations, N.Y. C.P.L.R. § 213, or by Virginia's one-year limitations period. Va. Code 1950 § 8.01–243. Determining which of these statutes of limitations apply here would require a fact-intensive application of New York's borrowing statute. UWA did not press the Court to decide this issue as it had the benefit of a seven year limitations period, even though its recovery was limited to damages caused by Aramony's criminal conduct.

*See Aramony II*, 1998 WL 205331, at *3–4. That conduct consists of the following: (1) miscoding of expenses which began in September 1989; (2) fraudulently causing UWA to issue a $375,000 annuity to Merlo in April 1990; (3) fraudulently causing UWA to purchase the Florida condominium in April 1990; and (4) fraudulently causing UWA to pay $5,000 to Merlo.

Aramony contends that UWA knowingly waived its right to recover any damages resulting from this misconduct when its Executive Committee expressed its approval of Aramony in February 1992. For the reasons set forth at Part III.B.2., *supra*, UWA did not waive any of its rights with respect to the miscoding of expenses or the $5,000 payment to Merlo, as it did not know of this conduct in February 1992.[30] This misconduct constitutes a breach of Aramony's fiduciary duty of loyalty to UWA. *See Luskin v. Seoane*, 226 A.D.2d 1144, 641 N.Y.S.2d 478, 479 (4th Dep't 1996).

## 2. Damages

UWA seeks to recover Aramony's salary during the period of his disloyalty and the consequential damages flowing from that disloyalty.

### a. Recovery of Aramony's Salary

■ Under New York law, a disloyal employee forfeits his right to compensation for services performed during the period of disloyalty. *See Bon Temps Agency, Ltd. v. Greenfield*, 184 A.D.2d 280, 584 N.Y.S.2d 824, 825–26 (1st Dep't 1992); *Henderson v. Rep Tech, Inc.*, 162 A.D.2d 1028, 557 N.Y.S.2d 224 (N.Y.A.D.4th Dep't 1990); *S. Tepfer & Sons, Inc. v. Zschaler*, 25 A.D.2d 786, 269 N.Y.S.2d 552, 554 (2d Dep't 1966). It is of no consequence that an employee's services may have been, on balance, beneficial to the employer. *See Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977).

■ Aramony engaged in criminal conduct from September 1989 until at least December 1991. As a result, Aramony must forfeit the salary that he received during that period—a total of $951,250, despite the credible trial testimony that UWA's rise to prominence as the nation's leading charitable organization was directly attributable to his efforts. UWA is, of course, precluded by the statute of limitations from recovering for Aramony's misconduct that occurred before September 1989.

### b. Recovery of Consequential Damages

In addition to recovering the salary that it paid to Aramony, UWA seeks to recover the following consequential damages: (1) between $12 million and $32 million in lost dues; (2) $1,804,085 in legal fees; (3) $373,653 in accountants' fees; (4) $140,426 in investigators' fees; (5) $1,126,767 for the cost of an employee resignation program; (6) $144,966 for interest on a loan taken to meet payroll costs in 1992 and 1993; (7) $19,314 for teleconferences allegedly held to mitigate damages; (8) $4,788 for the cost of producing and disseminating videotapes allegedly intended to mitigate damages; (9) $30,089 in public relations fees; (10) $653 in travel costs incurred by former General Counsel Charles Kolb; (11) $25,748 in photocopying costs incurred in responding to investigating agencies; (12) the $450,642 cost of canceling a 1992 conference in Washington, D.C.; (13) the $127,268 cost of finding a new president; and (14) the $5,464 cost of a special board meeting held in Plano, Texas.

---

UWA's recovery is also constrained by its limited proof of Aramony's misconduct. Aside from the testimony of Gorme and Duncan, which proved Aramony's pre-September 1989 miscoding of expense reports, UWA relied entirely on the estoppel effect of Aramony's conviction. Thus, the only misconduct proved by UWA within the limitations period, was that for which Aramony was convicted.

**30.** Although UWA waived its right to terminate Aramony and withhold his salary for conduct relating to the Merlo annuity and the Florida condominium, the Executive Committee's decision not to terminate him in February 1992 did not necessarily result in a waiver of *all* of UWA's rights against him. *Cf. Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1010–11 (S.D.N.Y.1995) (although party that elects to continue contract after learning of breach may not subsequently terminate contract, it may recover damages for those breaches). In any event, UWA has proven its breach of fiduciary duty claim based on misconduct that it did not know of in February 1992.

■ In an action for breach of fiduciary duty, a party may recover consequential damages without proving that his injury was foreseeable or anticipated; rather, he need only show that the breach was a substantial factor in causing the injury. *See Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir.1994); *accord Northwestern Nat'l Ins. Co. of Milwaukee v. Alberts,* 769 F.Supp. 498, 506 (S.D.N.Y.1991) (plaintiff alleging breach of fiduciary duty is not required to satisfy the high standard of proximate loss causation). The question, then, is whether the misconduct for which Aramony was convicted was a "substantial factor" in causing UWA to incur the aforementioned costs.

### i. Lost Dues

■ UWA seeks to recover dues payments that it allegedly lost in 1992, 1993, and 1994 as a consequence of Aramony's misconduct. UWA's expert witness, John Jarosz, calculated this loss as no less than $11.7 million and no more than $32.2 million. *See* Def.'s Ex. X2.

The total amount of dues pledged by the locals depends on two factors: (1) the amount of funds raised by the locals, and (2) the percentage of those dues that the locals agreed to pay to UWA. Both of these factors declined between 1991 and 1992 and then remained below the 1991 level until at least 1994. For example, the locals raised $3.17 billion in 1991, but only $3.04 billion in 1992, $3.05 in 1993, and $3.08 in 1994. Additionally, the percentage of revenues pledged by the locals in 1991 was .75%, but only .58% in 1992, .55% in 1993, and .57% in 1994. As a consequence of the post–1991 reduction in both the amount raised by the locals and the percentage of revenues pledged by them, the total dues pledged by the locals fell from $23.92 million in 1991 to $17.62 million in 1992, and then remained relatively unchanged for the next two years at $16.83 million in 1993 and $17.47 million in 1994. UWA asserts that this loss was a result, in whole or in part, of the public's adverse reaction to Aramony's criminal conduct.

#### a) Reduction in Dues Percentage

As discussed in Part II.*I., supra,* UWA reduced its dues percentage in early 1992, from 1% of revenues to a two-tiered formula of .6% or .75%, depending on the level of service that a local received from UWA. UWA contends that this reduction was necessary to induce the locals to resume dues payments that they were withholding. However, UWA presented no testimony from any witness with personal knowledge of the reason for the reduction. In fact, the only evidence in the record concerning UWA's decision to reduce the percentage shows that in December 1990—before the public was aware of any of Aramony's misconduct—the Board approved a reduction in the percentage from 1% to .95%, to take effect in 1992.

Even assuming that UWA reduced its percentage in response to the withholding of dues in early 1992, Aramony's criminal conduct was not a "substantial factor" in causing that reduction. The press reports in early 1992 focused on Aramony's salary, his "perks" (first-class travel, use of the Concorde and a chauffeured car, and a Super Bowl trip), UWA's relationship with its spin-offs, and Aramony's hiring of friends and relatives. The only criminal conduct which was even discussed in the press in early 1992 was the purchase of the Florida condominium. Given the myriad criticisms that were leveled at UWA, I find that news coverage of the condominium purchase played a minimal (if not minuscule) part in the locals' decision to withhold their dues payments in early 1992. Accordingly, Aramony's criminal conduct was not a substantial factor in causing UWA to reduce its dues percentage in early 1992.[31]

---

**31.** As noted above, in 1992, 1993, and 1994, the locals pledged less than was provided for under the .6%/.75% dual level dues percentage—committing only .58% of revenues in 1992, .55 % in 1993, and .57% in 1994. This shortfall, however, cannot be attributed to bad publicity. Rather, trial testimony revealed that, as a matter of course, the locals do not pledge the percentage of revenues prescribed by UWA. For example, in 1991, when the dues percentage was fixed at 1%, the locals pledged only .75% of the money they raised. *See* Jarosz Tr. at 661; Def.'s Ex. X2 at Tab 13. Assuming that the same shortfall occurred after 1991, then under UWA's dual level pledge formula, local United Ways would be expected to pledge between .45% (=.75 × .6%)

### b) *Reduction in Funds Raised*

 While it is possible that Aramony's criminal conduct was a substantial factor in causing the post–1991 reduction in monies raised by the locals, UWA has failed to sustain its burden of proof on this claim.[32] As discussed earlier, Aramony's criminal conduct made up only a small part of the bad publicity sustained by UWA in early 1992.

Nonetheless, it is likely that the public's attention became more focused on Aramony's criminal conduct after the release of the April 2, 1992 Verner Liipfert–IGI report and the September 1994 indictment. There is, however, insufficient evidence from which to conclude that these events caused a further drop off in dues pledged or collected.

The only evidence in the record concerning the public's knowledge of and reaction to misconduct at UWA is the opinion polls that UWA conducted in April, July and December 1992; June and December 1993; and October 1994.[33] *See* Def.'s Exs. Q3, W4, X4. A brief discussion of those polls is required.

In Aramony's favor, the April and July 1992 polls reveal that only a small percentage of the public (6% in April and 4% in July) recalled seeing or hearing news stories concerning Aramony's use of funds for personal gain or that he had stolen or embezzled money from UWA. But, when those who reduced their contributions in 1992 (7% of all respondents) were asked in December 1992 why they gave less, one-third listed "UWA media stories" as a justification (37% listed the economy as a reason and 15% said they had been pressured excessively to contribute). The results of that poll, however, do not provide any means for determining which of the many issues discussed by the press in 1992 caused those respondents (one-third of 7%) to contribute less than in prior years.

The December 1993 and December 1994 polls reveal that 12% of the public in 1993

and 14% in 1994 had heard about "problems with former president of UWA/Aramony." *See* Def.'s Ex. Q3. However, these poll results do not indicate what effect, if any, UWA's "problems" with Aramony had on the respondents' contributions to UWA. Respondents were also asked, "[a]re there any particular reasons why you did not make a contribution?" *See* Def.'s Ex. Q3. The poll results classify the responses to this question into such general categories as "scandal," "trust" or "media stories about UWA," making it impossible to determine how many, if any, of the respondents thought that Aramony's criminal conduct was the reason that they did not contribute to UWA. *See id.*

Based on this evidence, I cannot find that Aramony's criminal conduct was a "substantial factor" in causing a reduction in contributions to the locals. While Aramony's criminal conduct may have had some effect on donations, determining how much of an effect would require the Court to engage in impermissible speculation. An award of damages must have "a reasonable basis of computation" and should not be "merely speculative, possible or imaginary." 1 N.Y. PJI3d 1083 (citing *Matter of Rothko's Estate,* 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977)).

In summary, because Aramony's criminal conduct was not a "substantial factor" in causing the post–1991 reduction in dues percentage or in contributions, UWA's claim for lost dues is rejected.

### ii. *Costs Associated with Local Dissatisfaction*

UWA seeks to recover various costs that are directly attributable to the decline in local support for UWA in 1992, 1993, and 1994. First, it seeks to recover the costs that it allegedly incurred in canceling a 1992

---

and .56% (=.75 × .75%) of revenues raised, depending on the level of service received. The actual percentages pledged in 1992, 1993, and 1994 (.58%, .55%, and .57%, respectively), are therefore *higher* than UWA expected to receive after its change to a two-tiered dues formula.

**32.** If the revenues raised nationally by the locals had remained constant from 1991 through 1994,

then UWA would have received $754,000 more dues in 1992, $676,500 more in 1993, and $542,-800 more in 1994, than it received in those years. *See* Def.'s Ex. X2.

**33.** UWA also introduced polls from 1995 and 1996, *see* Def.'s Exs. R3, S3. These polls do not measure public opinion in 1992 through 1994, the period for which UWA claims lost dues.

Staff Leaders Conference in Washington, D.C. This conference was canceled because local representatives, who had been expected to attend, informed UWA that they were canceling. *See* Baerwald Tr. at 467–68. Second, UWA seeks to recover $144,966 in interest costs that it incurred when it borrowed money to meet its payroll in 1992 and 1993. UWA was forced to borrow this money as a result of the reduction in dues contributions. *See id.* at 466; Def.'s Ex. F3. Third, UWA seeks to recover $1,126,767 that it incurred in instituting an early-retirement program. UWA alleges that this program was necessitated by the drop-off in dues payments.

As explained in the prior section, Aramony's criminal conduct was not a substantial factor in causing the post–1991 decline in dues. Consequently, UWA cannot recover for the "downstream effects" of that decline. Aramony's claims for damages relating to the Washington, D.C. conference, the loan to cover payroll costs, and the early-retirement program, are therefore denied.[34]

### iii. *Legal Fees and Costs*

■ UWA seeks to recover $1,586,695 that it paid Verner Liipfert from 1992 to 1995 and $217,390 that it paid to Weil Gotshal between 1993 and 1996. As discussed above, Verner Liipfert provided the following services: (1) investigation of misconduct at UWA; (2) guidance and assistance in responding to subpoenas from the U.S. Attorney's office; (3) assisting UWA with respect to the New York State Attorney General's investigation; and (4) assisting UWA in the I.R.S. investigation. Weil Gotshal counseled UWA's Board members in connection with the New York state investigation and pre-

pared them to testify at Aramony's criminal trial.

UWA may recover those costs that are attributable to Verner Liipfert's investigation of Aramony's criminal conduct. Aramony's conduct was obviously a substantial factor in causing UWA to incur these investigative costs. UWA may also recover the costs of responding to subpoenas issued by the U.S. Attorney, as its investigation culminated in Aramony's conviction. There is no basis, however, for requiring Aramony to pay the other costs incurred by UWA relating to the criminal trial.

■ As noted earlier, the purpose of the New York Attorney General's investigation was to determine whether UWA's administration, financial operations, and governance complied with New York State laws applicable to the administration of charitable assets. The investigation culminated in an Assurance of Discontinuance that mandated widespread institutional reforms. Although Aramony's decisions as CEO may have affected all facets of UWA operations, UWA may recover damages only for Aramony's criminal conduct. Moreover, because UWA presented no evidence as to whether the Attorney General's investigation of UWA was closely related to the Attorney General's action against Aramony, I cannot determine whether any of UWA's costs were, in fact, related to the latter action. Accordingly, I cannot conclude that Aramony's criminal conduct was a substantial factor in causing the New York State Attorney General to investigate UWA. For substantially the same reasons, UWA cannot recover the costs associated with the I.R.S. investigation of UWA's tax exempt status, which focused on UWA, rather than on Aramony's criminal conduct.[35]

---

**34.** Because it cannot be demonstrated that Aramony's criminal conduct was a substantial factor causing local dissatisfaction with UWA, UWA is also precluded from recovering the costs of two teleconferences that were held in February 1992. UWA organized those conferences for the purpose of restoring lost confidence.

**35.** UWA seeks to recover $25,748 in photocopying costs which it claims it incurred in responding to subpoenas and document requests from the various agencies investigating Aramony and UWA. However, the UWA's ledger entry for this expense is not itemized. *See* Pl.'s Ex. D. It is

therefore impossible to estimate what portion of the copying was attributable to investigations of Aramony as opposed to UWA. Because any award on this damage claim would be speculative, UWA's request for its copying costs is rejected. This conclusion may appear contradictory to that reached with respect to accounting charges. *See* Part IV.A.2.b.v, *infra*. However, those charges were incurred on three specific tasks—auditing Aramony's and Merlo's expenses and the finances of the various spin-offs. There is no testimony as to the purpose of the photocopying other than that it responded to various investigations.

Having carefully reviewed the itemized Verner Liipfert and Weil Gotshal bills submitted by UWA, I find that UWA is entitled to recover $65,400 for Verner Liipfert's role in investigating Aramony's fraudulent conduct and $20,000 for Weil Gotshal's legal fees incurred in responding to subpoenas issued in the course of investigating Aramony's conduct.[36]

#### iv. *IGI Investigative Fees*

UWA also seeks recovery of the $140,426 that it paid IGI between 1991 and 1992. The amount of UWA's damage request is excessive because it includes the entire cost of the IGI investigation, rather than the specific costs of investigating Aramony's criminal conduct. Although UWA has not provided itemized bills for the 1991–1992 period, Baerwald described the shifting focus of IGI's investigation and IGI's interim and final reports were admitted in evidence. This evidence provides a sound basis for estimating the portion of IGI's investigation that related directly to Aramony's criminal conduct. Based on Baerwald's testimony and the content of IGI's reports, I conclude that UWA is entitled to recover $62,000, or approximately 45% of IGI's total bill.

#### v. *Accountants' Fees*

UWA further seeks to recover $373,653 in accountants' fees paid to Coopers & Lybrand between 1992 and 1994. From May 18 through October 20, 1992, the accounting firm reviewed Aramony's and Merlo's expense reports and audited the spin-off companies.[37] The bills for this period totaled $300,000. *See* Def.'s Ex. L3. The need to review Aramony's expense reports was a direct consequence of the intentional miscoding of expense reports for which he was convicted. UWA is therefore entitled to recover that portion of Coopers & Lybrand's fees that were attributable to this review. However, the accounting bills are not itemized and no evidence was offered at trial as to what portion of those fees were incurred as a

result of an audit of Aramony's expenses. The question, then, is whether an award of any recovery for these fees is speculative. I conclude that while it is far from certain, it is not too speculative to conclude that approximately half the time was spent unraveling the spin-off puzzle. Of the remaining time, I conclude that no more than half was spent auditing Aramony's expense reports. Thus, UWA may recover $75,000 (one-quarter of the requested accounting fees).

#### vi. *Media Relations Services and Videotape Production*

UWA requests $30,089 in damages for the costs of public relations services and media training provided by two firms: Hill & Knowlton and Smith & Harroff. UWA also seeks to recover the $4,788 cost of producing and disseminating videotapes, prepared in 1994, to assist the locals in responding to issues raised by Aramony's indictment. *See* Kolb Tr. at 559–60; Def.'s Ex. X3.

UWA retained Hill & Knowlton in December 1991 to formulate a strategy for minimizing the impact of the allegations that were expected to appear in *The Washington Post. See* Carter Tr. at 1843; Aramony Tr. at 112–13; Baerwald Tr. at 469; Def.'s Ex. C3. The firm's work was therefore directed at publicity that had little or nothing to do with Aramony's criminal conduct. As a result, UWA cannot recover Hill & Knowlton's fees.

Smith & Haroff, on the other hand, was retained in 1994 for the specific purpose of providing UWA's senior officials with media training in anticipation of inquiries regarding Aramony's indictment. *See* Kolb Tr. at 557–58; Def.'s Ex. C3. This media training was a reasonable effort to mitigate the harm caused by Aramony's criminal conduct. UWA is therefore entitled to recover Smith & Haroff's $4,950 fee. *See Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 648 (2d Cir.1989) (in action for intentional tort, party may recover costs reasonably in-

---

**36.** As previously noted, UWA's Board members voluntarily established a $1.5 million "Special Fund for Investigation" to pay legal fees resulting from the various investigations of UWA. Because the $85,400 award does not reimburse UWA for any fees incurred in relation to a gov-

ernment investigation, the award is not offset by any disbursements from the Special Fund.

**37.** UWA may not recover for the services performed after October 20, 1992, as those services did not concern Aramony's criminal conduct.

curred in mitigating damages). In addition, UWA is entitled to recover the $4,788 cost of producing and disseminating the videotape, which was also a reasonable effort at limiting the harm caused by Aramony's criminal conduct.

### vii. *Cost of UWA's Presidential Search*

 UWA claims that, as a result of Aramony's criminal conduct, it was required to retain search firms to assist in finding a new president, at a cost of $127,268. *See* Def.'s Exs. G3, H3. UWA has not proven that Aramony's criminal conduct caused it to incur higher search costs than it would otherwise have paid in seeking a replacement for Aramony, whose Employment Agreement was to expire on July 31, 1993. I therefore find that Aramony's criminal conduct was not a substantial factor in causing UWA to incur the cost of searching for a new president.

### viii. *Travel Costs*

 UWA seeks to recover the cost of certain travel expenses it incurred in 1993 and 1995. First, UWA seeks $5,464 for the cost of sending staff members to attend a 1993 Special Board meeting held in Plano, Texas. *See* Def.'s Ex. U3. According to Kolb, however, the Board met to discuss its legal strategy concerning Aramony's pension claims. *See* Kolb Tr. at 555–56, 572–73. Under the American rule governing the recovery of litigation-related costs, UWA's claim for travel expenses in connection with this Special Board meeting is rejected.

Second, UWA claims that it is entitled to recover the $653.00 cost of Kolb's travel from Virginia to New York to meet with the New York Attorney General's staff in November 1995. *See* Def.'s Ex. T3. Kolb testified that he went to New York to "discuss a variety of issues relating to the Aramony matter," Kolb Tr. at 562, presumably referring to the Attorney General's action against Aramony. Because there is no basis to conclude that these matters focused on Aramony's *crimi-*

*nal* conduct, UWA cannot recover the cost of Kolb's trip to meet with the New York Attorney General's office.

### B. *Count Five for Breach of Fiduciary Duty of Loyalty Under New York Not–for–Profit Law*

Count Five of the First Amended Counter-claim seeks to compel Aramony to account for the mismanagement of corporate assets and for the transfer, loss, or waste of corporate assets in violation of his duty of loyalty, pursuant to the New York Not–for–Profit Law § 720(a)(1). The Joint Pre–Trial Order makes no mention of such an accounting. Consequently, UWA has abandoned its claim for an accounting under § 720(a)(1) and that claim is therefore rejected. *See* Fed.R.Civ.P. 16(e); *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188, 206–07 (5th Cir.1998).

### C. *Count Two for Breach of the Employment Agreement*

#### 1. *Liability*

As discussed in Part III.C., *supra,* Aramony's criminal conduct violated both the express and implied duty of good faith that he owed UWA under the Employment Agreement.[38] Accordingly, Aramony is liable for breach of that agreement.

#### 2. *Damages*

UWA seeks the same damages in its breach of contract claim that it sought in its common law breach of fiduciary duty claim. It is plain that UWA cannot recover the same damages twice. *See Phelan v. Local 305 of the United Ass'n of Journeymen,* 973 F.2d 1050, 1063 (2d Cir.1992); *Ostano Commerzanstalt v. Telewide Sys.,* 880 F.2d 642, 649 (2d Cir.1989). With respect to those claims for which UWA has not recovered, those claims are rejected because UWA has not proved that its alleged injuries were

---

**38.** Like its breach of fiduciary duty claim, UWA's claim for breach of the Employment Agreement is limited to the conduct for which Aramony was convicted. Absent § 213–b, either New York's six year statute of limitations for breach of contract actions, N.Y. C.P.L.R. § 213, or Virginia's five year limitations period, Va.Code § 8.01–

246(2), would apply and the only evidence of a breach occurring within either of these periods is Aramony's 1995 judgment of conviction. Although § 213–b extends the statute of limitations to seven years, this limitations period applies only to the misconduct for which Aramony was convicted.

caused by Aramony's breach of his employment agreement. *See Kenford Co., Inc. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (1986) (damages on breach of contract claim "may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes"). Accordingly, UWA is not entitled to any additional recovery on its breach of contract claim.

### D. *Count Three for Breach of the Covenant of Good Faith and Fair Dealing*

Finally, UWA asserts a claim for breach of the covenant of good faith and fair dealing, which is premised on Aramony's breach of the Employment Agreement. This claim is duplicative of Count Two of UWA's counterclaims (Breach of Employment Agreement) and is therefore dismissed. *See Fasolino Foods,* 961 F.2d at 1056; *Village On Canon,* 920 F.Supp. at 534; *Centre–Point,* 913 F.Supp. at 209.

### E. *Prejudgment Interest*

 UWA is entitled to prejudgment interest on its breach of fiduciary duty counterclaim. The award of prejudgment interest on this state law claim is governed by state law. *Malson Ltd. v. Liberty Mutual Fire Ins. Co.,* 84 Civ. 1717 (CMM), 1986 WL 2963, at *1 (S.D.N.Y. March 3, 1986) (citations omitted). New York law provides for prejudgment interest in cases involving breach of fiduciary duty, *see McCoy v. Goldberg,* 810 F.Supp. 539, 546 (S.D.N.Y. 1993) (citations omitted), but such an award is not mandated. *See Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 484–85 (2d Cir.1983). Its award is "founded on the fact that the aggrieved party has been damaged by a loss of the use of the money or its equivalent and that unless interest is added the party aggrieved is not made whole." *Id.* Here, equitable considerations require that UWA be awarded prejudgment interest. Al-

though it can never be made whole, because some of the damage it suffered cannot be quantified, the interest award is a small contribution in this direction.

N.Y. C.P.L.R. § 5004 provides that pre-judgment interest is to be compounded on a simple basis at 9% per annum. The interest on the recovery of the salary paid to Aramony during his years of disloyalty, measured from the mid-point of each year for which his salary is forfeited, amounts to $662,805. UWA is also entitled to prejudgment interest on its consequential damages in the amount of $125,750.92.[39]

### F. *Punitive Damages*

#### 1. *Legal Standard*

 Punitive damages are not recoverable for an ordinary tort or breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights. However, where the defendant's misconduct involves a fraud evincing a "high degree of moral turpitude" and demonstrating "such wanton dishonesty as to imply a criminal indifference to civil obligations," punitive damages are recoverable if the conduct was "aimed at the public generally." *Rocanova v. Equitable Life Assurance Society of the United States,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994). The standard is "a strict one." *Cohen v. New York Prop. Ins. Underwriting Assn.,* 65 A.D.2d 71, 410 N.Y.S.2d 597 (N.Y.A.D.1st Dep't 1978). Punitive damages are an extraordinary remedy and are available "only in a limited number of instances." *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976).

A useful summary of current New York law governing the award of punitive damages for breach of contract or fiduciary duty is found in *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* 94 Civ. 5220, 1998 WL 665138 (S.D.N.Y. Sept.25, 1998). Defendants in that

---

**39.** All of UWA's consequential damages are awards for fees that it paid to service providers. I calculated interest on these damages from the midpoint date of the billing statements received from these service providers: June 1, 1993 for the legal services ($41,952.74); March 15, 1992

for IGI's services ($37,199.99); July 1, 1992 for the accounting services ($43,031.25); October 10, 1994 for Smith & Haroff's services ($1,825.31); and November 1, 1994 for the videotape production ($1,741.63).

case sought punitive damages based on *Rocanova*. *Baxter* noted that the Court of Appeals had recently summarized its *Rocanova* holding as follows:

> We set forth in the [*Rocanova*] decision the pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract. They are: (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 ...; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.

*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763 (1995).

The next step is to explore briefly each of these elements. First, Aramony's conduct is actionable as an independent tort as discussed at great length above. Aramony breached his fiduciary duty to UWA, and UWA has been awarded compensatory damages for that tort.

The second element requires that the conduct be "egregious". *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 491–92, 179 N.E.2d 497 (1961), defines the "egregious" nature of the conduct in the following terms:

> Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.... One who acts out of anger or hate, for instance, in committing assault or libel, is not likely to be deterred by the fear of punitive damages. On the other hand, those who deliberately and coolly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff.

*Id.; see also Gostkowski v. Roman Catholic Church of Sacred Hearts of Jesus & Mary*, 262 N.Y. 320, 186 N.E. 798 (1933) (defendant's conduct showed a conscious indifference to the effect of his acts on the minds of others).

The third element requires that the egregious conduct be directed to the plaintiff, here UWA. There is no quarrel with respect to this element. The indictment charged, and Aramony was convicted of, devising a scheme to defraud UWA.

Finally, the fourth element requires that the harm be part of a pattern directed at the general public. This element is discussed in the recent case of *Linkers (Far East) Pte., Ltd. v. Int'l Polymers. Inc.*, 94 Civ. 9226, 1996 WL 412854 at *4–5 (S.D.N.Y. July 23, 1996) (citations omitted).

> In addition to morally culpable conduct, however, the most current decisions by the Court of Appeals also appear to require conduct that is 'part of a pattern directed at the public generally' before punitive damages may be imposed. [The *N.Y. Univ.* court further required 'egregious conduct ... directed to plaintiff,' as noted above.] Thus, *N.Y. Univ.* and *Rocanova* invoke a distinction articulated most clearly in *Walker*, where the court defined 'a gross and wanton fraud upon the public' by contrasting it with 'an isolated transaction incident to an otherwise legitimate business.'

*Id.; see also United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996) (dismissing punitive damages claim because "none of this ... evinces a pattern of conduct harming the general public."); *Brower v. Nydic, Inc.*, 1 F.Supp.2d 325, 326 (S.D.N.Y.1998) (same).

The New York State Pattern Jury Instructions standard charge regarding punitive damages provides that the trier of fact may award punitive damages if the act of the defendant that caused the injury was wanton, reckless, or malicious in order to discourage the defendant and others from acting in a similar manner in the future. Committee on Pattern Jury Instructions, *New York Pattern Jury Instructions*, 2:278 (3d ed. 1997) ("PJI"). The charge further states: "[Y]ou

may award such amount as in your sound judgment and discretion you find will punish the defendant and discourage the defendant or other people from acting in a similar way in the future." *Id.* The Comments following the pattern instruction explain that there must be either proof of recklessness or a conscious disregard of the rights of others to justify a punitive damages award. 1 N.Y. PJI 3d 1097.

 There is no exact rule by which a finder of fact determines the amount of punitive damages. Moreover, the amount need not have any particular relationship to the compensation award. PJI 2:278. However, there are limits that the trier of fact cannot exceed and "it is the duty of the court to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the *mala fides* of the defendant in the particular case." *Faulk v. Aware, Inc.,* 19 A.D.2d 464, 244 N.Y.S.2d 259 (1st Dep't), *aff'd,* 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778 (1964). Punitive damages should bear "some reasonable relation to the harm done and the flagrancy of the conduct causing it." *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904, 910 (4th Dep't 1975).

### 2. *Award of Punitive Damages*

██ The New York Court of Appeals has held that punitive damages must be proved by a preponderance of the evidence. *See Corrigan v. Bobbs–Merrill Co.,* 228 N.Y. 58, 66, 126 N.E. 260 (1920). As noted above, the award of punitive damages is discretionary. I find that UWA is entitled to an award of punitive damages.

There is no question that UWA has met the four-part test set forth above. As noted, elements one and three were established by plaintiff's recovery of compensatory damages. There is no doubt that defendant's conduct was egregious, as defined in the cited cases. There is no question that Aramony "deliberately and coolly engage[d] in a far-flung fraudulent scheme, systematically conducted for profit." *Walker,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497. The fourth element is also met. Aramony's misconduct was clearly directed at the public

because the United Way is a quintessentially public charity. Defrauding the United Way is akin to an attack on motherhood or the flag. Millions of Americans have contributed to the United Way, intending to benefit the neediest members of our society. Aramony's conduct, in some small way, squandered those contributions. This is certainly a harm directed at the public. Finally, it is beyond cavil that Aramony acted recklessly with a conscious disregard for the rights of others.

As noted earlier, the purpose of such an award is both punishment and deterrence. To a large extent both goals have already been served by Aramony's criminal conviction. He was sentenced to 78 months in prison, no small thing for a man in his late sixties. In addition, he was fined $300,000 and required to pay an assessment of $1,150. This is a significant punishment and one that is likely to deter any other executive of a non-profit charitable organization from following in Aramony's footsteps. Nonetheless, there is still a need for punitive damages. The criminal conviction, while a significant punishment, does not punish Aramony for the fact that he harmed UWA by causing a loss of public trust. The wanton and reckless nature of his misconduct exposed the UWA to contempt and ridicule, and angered its most ardent supporters. The harm done to the United Way cannot be quantified in dollars and cents. Thus, I will impose a token punitive damage award to be sure that those who abuse the public, on whose behalf they supposedly work, are punished and that others in that position are deterred. An award of $50,000, in view of the criminal sentence already imposed, meets that goal.

## V. CONCLUSION

For the reasons set forth above, UWA is required to pay Aramony RBP benefits totaling $3,221,057. He is entitled to prejudgment interest on this award ($1,177,121.39), but not to an award of attorneys' fees. Aramony is not entitled to recover the $300,000 he seeks under the SBA, because that plan did not contain a non-forfeiture provision. Finally, Aramony is not entitled to the remainder of his salary as he breached his

employment agreement by engaging in fraudulent, dishonest and criminal conduct.

Aramony, in turn, is required to repay $951,250 to UWA, for the salary he received from 1989–1992, the years covered by the statute of limitations during which he engaged in criminal conduct. He is also required to pay $232,138 in consequential damages flowing from that criminal conduct. Aramony must pay prejudgment interest on both of those awards ($788,555.92). Finally, he must pay UWA $50,000 in punitive damages. Upon execution of a final judgment, the Clerk is directed to close this case.

SO ORDERED.